BARKLEY, Appellant,

v.

BARKLEY, Appellee.

[Cite as *Barkley v. Barkley* (1997), 119 Ohio App.3d 155.]

Court of Appeals of Ohio,
Fourth District, Pickaway County.

No. 96CA5.

Decided April 14, 1997.

156

*James R. Kingsley*, for appellant.

*Gary R. Dumm*, for appellee.

HARSHA, Judge.

Phyllis Barkley appeals from a judgment of the Pickaway County Court of Common Pleas that granted the parties a divorce and divided their marital property.

Phyllis Barkley and John Barkley were married in 1989. As the result of marital discord, the wife filed a complaint for divorce in 1993. The husband answered and filed a counterclaim for divorce. After a final hearing, the trial court granted both parties' complaints for divorce on the ground of incompatibility. The court determined what constituted the parties' separate property and distributed their marital property under R.C. 3105.171. The wife has filed a

notice of appeal challenging several specific aspects of the court's distribution of property.

Appellant's first assignment of error asks:

"Did the trial court commit prejudicial error when it awarded husband the Sylvan lots?"

■ When a trial court grants a divorce, the court must determine what constitutes the parties' marital property and what constitutes their separate property. R.C. 3105.171(B). The trial court's characterization of the parties' property involves a factual inquiry. *Wright v. Wright* (Nov. 10, 1994), Hocking App. No. 94CA2, unreported, 1994 WL 649271. As an appellate court, we review the determinations under the standard of manifest weight of the evidence. *Wylie v. Wylie* (May 30, 1996), Lawrence App. No. 95CA18, unreported, 1996 WL 292044; *Miller v. Miller* (Dec. 1, 1993), Washington App. No. 93CA7, unreported, 1993 WL 524966.

■ A judgment of a trial court will not be reversed as being against the manifest weight of the evidence if the court's judgment is supported by some competent, credible evidence. *Sec. Pacific Natl. Bank v. Roulette* (1986), 24 Ohio St.3d 17, 20, 24 OBR 14, 16, 492 N.E.2d 438, 440; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. This standard of review is highly deferential and even "some" evidence is sufficient to sustain the judgment and prevent a reversal. A reviewing court should be guided by a presumption that the findings of a trial court are correct, since the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use those observations in weighing the credibility of the testimony. *In re Jane Doe I* (1991), 57 Ohio St.3d 135, 566 N.E.2d 1181. See, also, *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273.

■ Once the trial court has determined the status of the parties' property, the court should normally award each spouse his or her separate property and then distribute the marital estate equally unless an equal division would be inequitable. R.C. 3105.171(D) and 3105.171(C). The statutes vest the trial court with discretion to do what is equitable under the facts and circumstances of each particular case. *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 130, 541 N.E.2d 597, 598–599; *Cherry v. Cherry* (1981), 66 Ohio St.2d 348, 355, 20 O.O.3d 318, 322, 421 N.E.2d 1293, 1298–1299. An appellate court should not reverse the judgment of the trial court unless it appears that the trial court abused its discretion in dividing marital property. *Martin v. Martin* (1985), 18 Ohio St.3d 292, 294–295, 18 OBR 342, 343–344, 480 N.E.2d 1112, 1113–1115. An abuse of discretion is more than a mere error of judgment; it implies the court's attitude is arbitrary,

unreasonable or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

Prior to the parties' marriage, both the husband and the wife owned their own separate homes. After they married, the husband moved into the wife's home. The couple had discussed the possibility of either building or purchasing another house to use as their marital residence. To that end, on May 29, 1990, the husband sold his home and placed most of the proceeds in an investment account. On the same day, the husband used $38,000 from the sale of his house to purchase Lot Numbers 127 and 128 in the Sylvan subdivision. While the money to purchase these lots came from the husband's separate property, the deed to the lots named both parties as grantees. Prior to filing for divorce, the couple could not agree on a house design, so the lots have remained vacant.

The wife argues in light of the joint deed and her testimony that the husband said the lots were a gift, that, at worst, the property should be considered a marital asset. The husband claims, and the trial court found, that the Sylvan lots were his separate property since he could directly trace the $38,000 purchase price of the lots to the proceeds from the sale of his house. The court determined that, although the property was titled in both parties' names, the husband did not intend to make an outright gift of a one-half interest in the lots to the wife or to convert the lots into a marital asset. The court found that titling of the lots in both names was done on the condition that both parties would contribute financially and build a dream home on the property.

Marital property includes all real property that currently is owned by either or both of the spouses and that was acquired by either or both of the spouses *during* the marriage. R.C. 3105.171(A)(3)(a)(i). Thus, property acquired during the marriage is presumed to be marital in nature unless it can be shown to be separate. Separate property includes any property acquired by one spouse *prior to* the marriage. R.C. 3105.171(A)(6)(a)(ii). It is presumed that a spouse's premarital property, remains separate property as long as it is traceable, regardless of whether it has been commingled with other property. Baldwin's Ohio Domestic Relations Law (1992) 107, Section 4.08(B)(1)(f). However, a spouse can change separate property into marital property by the spouse's own actions. Baldwin's, *supra* (Supp.1996) 46, Section 12.04(E).

The most commonly recognized method of effectuating this change is through an *inter vivos* gift. One line of thinking holds that when a spouse transfers property to the other spouse, the transfer is presumed to be a gift unless it is shown to the contrary. The burden of proof lies with the party attacking the gift. This seems especially appropriate when the transfer is memorialized by a formal legal document such as a deed. See *Pettry v. Pettry* (1991), 81 Ohio App.3d 30, 610 N.E.2d 443, and Baldwin's, Section 4.04(A)(6). The other approach rejects

the gift presumption and adopts a more flexible totality-of-the-circumstances test to determine whether transmutation of the separate property has occurred. See *Kuehn v. Kuehn* (1988), 55 Ohio App.3d 245, 564 N.E.2d 97,[1] and *Anderson v. Anderson* (July 7, 1992), Hocking App. No. 91CA1, unreported, 1992 WL 174716.

While we believe that the approach adopted in *Pettry* has much to recommend it when dealing with deeded real estate, we cannot overlook the significance of R.C. 3105.171(H), which states:

"Except as otherwise provided in this section, the holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital property or separate property."

We take this statute to be a legislative ratification of the flexible approach adopted by *Kuehn, supra,* and followed by the trial court here. Thus, we believe that R.C. 3105.171(H) means that the form of title is relevant to, but not conclusive of, the classification of property as being *either* marital or separate. In other words, property held jointly may ultimately be determined to be separate (see *Bower v. Bower* [Mar. 3, 1995], Sandusky App. No. 5–94–14, unreported, 1995 WL 84708; *Domrose v. Domrose* [Sept. 16, 1994], Ottawa App. No. 93OT054, unreported, 1994 WL 506180; *Irwin v. Irwin* [May 11, 1993], Green App. No. 92–CA–54, unreported, 1993 WL 169124; *Baker v. Baker* [Feb. 10, 1993], Meigs App. No. 477, unreported, 1993 WL 33309; *Anderson v. Anderson, supra*), while other property held individually may, in fact, turn out to be marital (see *Williams v. Williams* [Aug. 21, 1996], Medina App. No. 2480–M, unreported, 1996 WL 470658). The effect of the statute is to negate the presumption of a gift, but not to preclude such a finding upon an appropriate factual context.

There is no dispute that the source of the money to buy the lots came from the husband's separate property. Accordingly, our inquiry focuses on whether the trial court was factually correct in finding that the appellee lacked the required donative intent to transfer a present possessory interest in the lots to the appellant when he had her name placed on the deeds along with his.[2]

---

1. *Kuehn* outlines six factors that a court should consider in determining whether separate property has been transmuted: "(1) the expressed intent of the parties insofar as it can be reliably determined; (2) the source of the funds, if any, used to acquire the property; (3) the circumstances surrounding the acquisition of the property; (4) the dates of the marriage, the acquisition of the property, the claimed transmutation and the breakup of the marriage; (5) the inducement for and/or purpose of the transaction which gave rise to the alleged transmutation; and (6) the value of the property and its significance to the parties." *Id.* at 246, 564 N.E.2d at 99.

2. The essential elements of an *inter vivos* gift are (1) intent of the donor to make an immediate gift, (2) delivery of the property to the donee, (3) acceptance of the gift by the donee. *Bolles v. Toledo Trust Co.* (1936), 132 Ohio St. 21, 7 O.O. 60, 4 N.E.2d 917.

■ We believe that the following testimony of the appellant on cross-examination, when taken in conjunction with the source of the funds, provides a sufficient basis to support the trial court's finding, notwithstanding the fact that we may well have decided the issue differently: [3]

"Q. When the real estate closing took place, was Phyllis there?

"A. I don't think so.

"Q. Now, this deed is in two names?

"A. Yes.

"Q. It is in your name and Phyllis' name?

"A. Yes.

"Q. Did someone ask you how to prepare the deed before it was transferred to you?

"A. Yes.

"Q. What did they ask you?

"A. Well, whether I wanted it in both names.

"Q. And your response was both names?

"A. Yes.

"Q. Before that decision was made, did you discuss this with Phyllis to determine whether or not it should be in your name or her name?

"A. I don't know. But it is pretty clear to me that Phyllis wanted it in both names.

"Q. * * * The house at Hagerty Road was in your name only?

"A. Yes.

"Q. You were using only money from your house?

"A. Yes.

"Q. Yet you went and put this deed in Phyllis' name showing an undivided one-half interest. Why did you do that?

"A. I think I was stupid.

"Q. That may be hindsight, I guess. But at the time why did you do it?

---

**3.** Obviously, it is difficult to determine a spouse's intent at a prior time based upon an expression of that intent that is given after a relationship has broken down. Notwithstanding this difficulty, such a decision is better left to the trier of fact than a reviewing court. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276.

"A. Because that was the lot to build our house on, a house that would be funded by the sale of my house and the sale of Phyllis' house.

"Q. Did you intend to give her one-half interest in that lot with no strings attached on the day that you signed that deed?

"A. Absolutely not.

"* * *

"Q. * * * [W]hat condition were you intending to retain or impose on there?

"A. I planned to build a house on it.

"Q. * * * Isn't it true that you and in a magnificient [*sic*] gesture on behalf of your wife, you said I'll buy these lots and give her half and you can have your dream home on this, is all you were concerned about that day?

"A. That's crazy. No.

"Q. Why is that crazy? What is that no?

"A. I did not give the one lot to Phyllis. It was a step in the process of getting to our house.

"Q. And except for the fact that this divorce was intervening, you would have still left it in her name?

"A. We intended to live there in a house that we built there."

We realize that the appellant testified that her husband specifically stated the lots were a gift when he surprised her with the paperwork. But the husband disputed most of the wife's version of the transaction. There is some evidence in the record to support the trial court's finding that the transfer was conditioned upon building a marital home that was to be funded in part by future contributions from the wife. The court's conclusion that the appellee lacked donative intent is not against the manifest weight of the evidence, making appellant's first assignment of error meritless.

Appellant's second assignment of error asks:

"Did the trial court commit prejudicial error when it excluded appreciation of that part of husband's SIP owned before marriage?"

Prior to their marriage, the husband had accumulated $153,531 in a savings and investment plan ("SIP") maintained by his employer. This money is clearly the husband's separate property pursuant to R.C. 3105.171(A)(6)(a)(ii). When the parties separated three and a half years later, the SIP was valued at $250,932. Thus, the value of the SIP increased by $97,401 during the marriage.

The increase in the SIP's value was broken down by a certified public accountant as follows. During the marriage, the husband contributed $26,635 to

the plan, while his employer contributed $7,700. Based on a nine-percent return on his investments, the additional funds contributed during the marriage earned $14,703. Thus, the portion of the SIP that accumulated during the marriage is $49,038. This money is clearly marital property pursuant to R.C. 3105.171(A)(3)(a)(i).

The difference between the $97,401 total increase in the SIP and the $49,038 portion that constitutes marital property is $48,363. This money represents the increase in value due to investment earnings on the husband's separate property and is the subject of this assignment of error. The wife contends that these earnings should be considered marital property pursuant to *Pickens v. Pickens* (Nov. 12, 1993), Meigs App. No. 92CA501, unreported, 1993 WL 481354. On the other hand, the husband submits that this money is merely passive income earned on his separate property, which remains his separate property.

Marital property includes all income and appreciation on separate property due to the labor or monetary or in-kind contribution of either of the spouses that occurred during the marriage. R.C. 3105.171(A)(3)(a)(iii). Conversely, separate property includes passive income and appreciation acquired from separate property by one spouse during the marriage. R.C. 3105.171(A)(6)(a)(iii). "Passive income" is defined as "income acquired other than as a result of the labor, monetary, or in-kind contribution of either spouse." R.C. 3105.171(A)(4).

In *Pickens*, the husband owned shares in the Putnam Growth Fund that were valued at $61,000, prior to his second marriage. Although he made no additional contributions to the fund during the marriage, he did reinvest dividends that were earned during that time. The fund was worth $536,800 when the couple separated. Judge Stephenson noted, "Logic would dictate that it be viewed no differently than if [the dividend income] had been disbursed directly to appellant who then spent the cash on additional shares." As such, the dividend income constituted marital property, since it was acquired during the marriage.[4]

The court in *Walkup v. Walkup* (1986), 31 Ohio App.3d 248, 31 OBR 532, 511 N.E.2d 119, was presented with the appreciation of stock that was purchased with the husband's separate funds. In determining that such appreciation remained separate property, the court reasoned that "because the increase in the stock's

---

4. Another factor, as noted in Judge Harsha's concurring opinion, was that $160,722 of marital funds was devoted to protecting the investment fund in the form of income tax payments. Although declining to adopt a *per se* rule that using marital funds to pay taxes on separate property converts passive appreciation into a marital asset, Judge Harsha stated that, in that case, the trial court did not abuse its discretion due to the significant nature of the marital income used to pay the taxes, which otherwise would have been available for marital use. In this case, there is no evidence that marital funds were used to pay any taxes on the appreciation of the husband's SIP.

value was in no part due to any effort by appellee, and because neither marital funds nor labor was expended to increase the stock's value, it would be inequitable in this case to divide the appreciation." *Id.* at 250–251, 31 OBR at 535, 511 N.E.2d at 122.

After examining the rationale supporting these two cases, we believe that the trial court's characterization of the appreciation in the SIP as the husband's separate property is not against the manifest weight of the evidence. We believe that the mere appreciation in the value of separate property stock, *e.g.*, from $5 to $150 per share, which is unrelated to the labor or monetary or in-kind contribution of either spouse, is passive income and remains separate property.

The record contains no evidence concerning the nature of the SIP's appreciation. That is, the wife presented no evidence that the SIP's increase in value was related to the reinvestment of dividends that could have been disbursed or that marital funds were used to pay income taxes on the appreciation, as in *Pickens*. Nor was there any testimony that the increase was related to any labor or monetary or in-kind contribution on the wife's part, as in *Walkup*. In the absence of such evidence, the trial court was correct in considering the increase to be mere passive appreciation acquired from the husband's separate property. Accordingly, appellant's second assignment of error is overruled.

Appellant's third assignment of error asks:

"Did the trial court commit prejudicial error when it gave husband credit in the amount of $10,424 for alterations to wife's home?"

During the hearing, the husband testified about various improvements to the wife's house that he paid for during their marriage. According to his testimony, the out-of-pocket cost for these improvements was $9,624. In addition, the husband testified that he spent $800 to install an invisible fence in the back yard. The wife stated that, although some of the improvements were necessary in order to eventually sell the house, many of the upgrades were performed over her objection and were solely for the husband's benefit.

In making its property award, the trial court determined that the $10,424 in improvements paid for by the husband was marital property subject to distribution. Since these upgrades were incorporated into the wife's house, which she continues to own, the total out-of-pocket cost of these improvements was included in her award of the marital property. On appeal, the wife contends that the court erred in giving the husband dollar-for-dollar credit for these expenditures. Instead, she submits that the proper form of valuation is the difference between the fair market value of her house after the improvements and the fair market value of her house before the improvements.

We were recently presented with a similar issue in *Moran v. Moran* (Jan. 28, 1997), Ross App. No. 96CA2192, unreported, 1997 WL 40607. In that case, the husband was given property by his father prior to the parties' marriage. The property was later used as the couple's marital residence. During the marriage, the couple made numerous improvements to the property. The trial court awarded the wife an extra $3,765 in marital property in order to compensate her for the improvements made to the husband's separate property. The wife challenged this award on appeal as being arbitrary and unreasonable. This court affirmed the award since the wife failed to present any testimony concerning the value of the improvements as opposed to the total value of the marital residence, *i.e.*, $35,000.

Likewise, in this case, the wife's attorney valued her house at $125,000. We note, however, that the record does not reflect whether this is a pre- or post-improvement valuation. In any event, the record reveals only this one value, so regardless of which of the two values it represents, there was no evidence about the value of the other. The only other evidence concerning value before the trial court revealed that the husband spent $10,424 on improvements to the wife's house. In the absence of any evidence to determine the difference between the fair market value of the house before and after the improvements, the court's decision to award husband the cost of the improvements is not arbitrary, unreasonable, or unconscionable. Accordingly, appellant's third assignment of error is overruled.

Appellant's fourth assignment of error asks:

"Did the trial court commit prejudicial error when it awarded husband personal property admitted to have been gifted to wife?"

Based on the testimony at trial, the trial court determined that the following articles were marital property: jewelry valued at $6,800, a VCR valued at $250, a camcorder valued at $750, an exercise bike valued at $200, a mountain bike valued at $390, and theater tickets valued at $280. Although each of these articles was distributed to the wife as part of the marital property award, she alleges that she was entitled to this property outright, as her separate property.

Marital property includes personal property that currently is owned by either or both of the spouses and that was acquired by either or both of the spouses during the marriage. R.C. 3105.171(A)(3)(a)(i). Separate property includes property acquired by one spouse prior to the date of the marriage, R.C. 3105.171(A)(6)(a)(ii), as well as property found by the court to be a gift given to only one spouse, R.C. 3105.171(A)(6)(a)(vii). Unless it is part of a distributive award to supplement the division of marital property, a spouse's separate property must be awarded to that spouse. R.C. 3105.171(D).

At the hearing, the husband produced a list of assets that he claimed were acquired during the marriage. The list detailed many pieces of property, including all of the items listed above. When the wife's attorney went over this list of property during the hearing, her testimony revealed the following information:

JEWELRY

"Q. * * * Okay. He claims he gave you $6,800.00 in jewelry. Did he make gifts of jewelry and if so what were they?

"A. I did get a gift of a necklas [sic] as a wedding gift, I don't know the value of that. I have my wedding rings, I do have an appraisal on this. There was a necklas [sic] which all of my diamonds went into that from my first wedding and engagement rings, and some watches and another diamond necklas [sic] that I took the diamonds out of that also. I had some old jewelry traded in on the gold, and John had a couple of pieces, some class rings that he inherited from his uncle, and he traded it in, so essentially he paid for the making of the necklas [sic], but the diamonds are mine and the biggest part of the gold was mine. So the total is not his.

"Q. I understand. I'll put it this way, the jewelry which you acquired, was it given to you on a special occasion as a gift?

"A. Yes.

"Q. Any jewelry that you now have that wasn't given to you as a gift?

"A. No.

"Q. And for what purposes, what occasion did you receive jewelry as a gift?

"A. I received the necklas [sic] as a wedding gift. I received—I had a large ten thousand dollar diamond solitare [sic] that John remounted, he bought the mounting and that was my Christmas gift. I have a pair of diamond earrings that I put money into from my mother, she put one hundred fifty dollars, which was included for my birthday and a Christmas gift one year, so those are the only partials that he puts into it."

VCR

"Q. The VCR $250.00. You need to agree if this is bought after the marriage. These are all new purchases?

"A. But it is important to know where the money came from on that. His mother gave us both money for Christmas and it was designated to go into a VCR.

"Q. You claim that is a Christmas gift jointly to both of you?

"A. Yes, sir."

CAMCORDER

"Q.   Yes you know where the money came from for the video camera?

"A.   John bought that as his, and I didn't know what he was up to for sure, but that was his going away gift to me just before we separated, and he went to California, and he said this is your going away gift.   I didn't know what he meant by going away gift.   I did soon afterwards.

"Q.   You are claiming that was a gift to you?

"A.   Yes. He stated that was my going away gift."

EXERCISE BIKE

"A.   * * * The chiropractor recommended that I be on an exercise equipment and so he was going out—he bought me the equipment for that?

"Q.   Exercise bike?

"A.   No. That was mine.   That was—

"Q.   Before the marriage?

"A.   Yes. I think so."

MOUNTAIN BIKE

"Q.   The mountain bike?

"A.   That was my birthday present, a birthday present."

THEATER TICKETS

"Q.   Theater tickets.   I don't know what that is but $280.00.   Do you know what that covers?

"A.   Yeah. That is the Columbus Symphony Orchestra, but—is what you are talking about?

"Q.   Did you use them?

"A.   I didn't go by myself.   No. I did not use them."

R.C. 3105.171(A)(6)(a)(vii) provides that any gift to a spouse, whether from the other spouse or from a third party, is presumed to be marital property, unless it can be proved otherwise by clear and convincing evidence.   Baldwin's, *supra,* (1992) 108, Section 4.08(B)(1)(f).   This provision is seen as a compromise between those who support the tenet that all gifts are separate property and those who believe that all gifts given during marriage should be marital property. *Id.* at 108, fn. 187.   Appellant, as the party seeking to have the property deemed separate and thus nonmarital, bears the burden of proof on this issue.   "Clear and convincing evidence" means that degree of proof which will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be

established. *Cincinnati Bar Assn. v. Massengale* (1991), 58 Ohio St.3d 121, 122, 568 N.E.2d 1222, 1222–1223; *Reynolds v. Reynolds* (Feb. 8, 1993), Clinton App. No. CA92–07–013, unreported, 1993 WL 29058.

In *Focke v. Focke* (1992), 83 Ohio App.3d 552, 615 N.E.2d 327, during their marriage, the husband gave the wife a coin collection, furs, and jewelry. The trial court found this property to be marital, not separate, and the wife appealed. Likewise, in *Marsala v. Marsala* (July 6, 1995), Cuyahoga App. No. 67301, unreported, 1995 WL 396360, the husband gave jewelry to his wife during their marriage. Again, the trial court found the property to be marital, and the wife appealed. In both cases, the appellate courts held that, although it was reasonable to conclude that the husbands gave their wives these gifts, the wives did not present clear and convincing evidence that their husbands intended to waive all of their rights and interest in the items as marital property. Therefore, the trial courts' judgments finding the personalty to be marital property were upheld.

In this case, we also believe there was competent, credible evidence to support the court's characterization of these articles of personalty as marital property. The wife's testimony[5] did not prove to the trial court, by clear and convincing evidence, that these items of property were given as gifts solely to her as required by R.C. 3105.171(A)(6)(a)(vii). Since the evidence did not adequately demonstrate that appellee intended to give up any interest he may have had in the property, each of these items was subject to distribution as marital property. Accordingly, appellant's fourth assignment of error is overruled.

Appellant's fifth and final assignment of error asks:

"Did the trial court commit prejudicial error when it did not address the Equiline debt on wife's residence?"

R.C. 3105.171(F)(2) specifically provides that in making a division of marital property, the trial court must consider both the assets and the liabilities of the parties. After examining the trial court's written decision in this case, it is obvious that the court did not consider the parties' home equity liability before dividing the marital property.

After the parties married, the couple jointly assumed liability for an equity line secured by the wife's house. During her redirect examination, the wife gave the following testimony concerning the current balance on the home equity line of credit:

"Q. Mr. Dumm had brought up this issue of you now have an equity line balance. Do you know when John paid the $12,000.00 assuming it shows that was paid, we'll have some paper work coming up, that supposedly was paid down to

---

5. The husband did not testify about this list of contested marital property.

zero and any charges any credits, excuse me, any draws you would have made on the equity line after that date would be for your purposes only?

"A.  I was still married.  John wanted me to use the equity line because we could deduct it off our income tax.

"Q.  Here's the question.

"A.  So we used it for the household and whatever we needed, anything.

"Q.  Are you stating to the court part of the $4,800.00 that you now own on the equity line account were used while you were married to John and benefitted him in some way?

"A.  Yes.

"Q.  And can you tell us what the charges on that would be?  What did you buy with that?

"A.  I really don't have it all broken down.  Even such things as groceries, clothes, any place where you would use a credit card because we were doing that so we could have income tax deductions.

"Q.  * * * Since your separation—

"A.  Right.

"Q.  —have you charged on that $4,800.00 balance?

"A.  No. Because it was more than that.  I have been paying a hundred dollars a month, you know, $60.00 of it goes to interest and $40.00 for principal, so it was over $5,000.00 and I have been paying on it.

"Q.  At the time of separation your debts would have consisted of the equity line of $5,000?

"A.  Yes."

The husband offered no testimony that the current balance on the parties' home equity line was anything other than marital debt used to pay ordinary household expenses.

Although the trial court is vested with broad discretion to equitably distribute the parties' marital property based on the facts and circumstances of each particular case, the court must do so in light of the factors listed in R.C. 3105.171(F).  The trial court abused its discretion in formulating the division of marital property in this case by essentially disregarding nearly $5,000 in marital debt.  The trial court's failure to take this debt into consideration before dividing the parties' marital assets was arbitrary and unreasonable.  Accordingly, appellant's fifth assignment of error is sustained.

Therefore, the judgment of the Pickaway County Court of Common Pleas is hereby affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

*Judgment affirmed in part*
*and reversed in part.*

PETER B. ABELE and KLINE, JJ., concur.