This is an appeal from an Athens County Common Pleas Court judgment, upon a bench trial, in favor of Danny Simms, plaintiff below and appellee herein, on his claim against Steve Heskett, defendant below and appellant herein. The following errors are assigned for our review:
FIRST ASSIGNMENT OF ERROR:
 "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR A DIRECTED VERDICT AT THE CLOSE OF PLAINTIFF'S CASE IN CHIEF."
SECOND ASSIGNMENT OF ERROR:
 "THE TRIAL COURT'S JUDGMENT IN FAVOR OF PLAINTIFF ON THE COMPLAINT AS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
THIRD ASSIGNMENT OF ERROR:
 "THE TRIAL COURT'S JUDGMENT IN FAVOR OF PLAINTIFF ON THE COUNTERCLAIM WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
A brief summary of the facts pertinent to this appeal is as follows. Appellee owns real estate near Nelsonville in Athens County, Ohio. He decided several years ago to build a structure on the property that would be both a "home as well as a garage." Appellee contacted a retired builder, Bennie Glenn, to see if he would take on the project. Mr. Glenn came up with a proposed building plan, but he and appellee were unable to come to terms on a price. Appellee was then approached by appellant who was one of the workers that Mr. Glenn would have hired for the project had his proposal been accepted. Appellant offered, on his own, to build appellee a "pole barn" for the sum of $51,900. The offer was accepted by appellee and the two of them entered into a contract on December 4, 1997 for construction of the proposed building.
It appears that the working relationship between these two men was contentious from the outset. Appellee admitted that there were a number of altercations between them and explained that this was because the building was erected in a "hap-hazard" manner with "slip shot work." Appellant claimed, on the other hand, that appellee insisted on controlling everything that was done to the building and supervised him and his workers "[d]ay by day, minute by minute." In any event, after appellant completed work on the project, there were considerable problems with the structure which other workers had to be brought in to correct.
Appellee filed suit on July 31, 1998, claiming that he had a contract with both appellant and Mr. Glenn and that they had breached that contract by "stopp[ing] construction of the building prior to [its] completion." He further alleged that the part of the pole barn which had been finished was "negligently constructed." Appellee demanded compensatory damages in the amount of $51,900.
Mr. Glenn filed an answer denying that he was ever a party to the construction contract.[1] Appellant then filed his own answer denying liability and raising numerous affirmative defenses. He also filed a counterclaim alleging that appellee still owed him $4,500 for "services and material provided" in construction of the building and that appellee had also retained and converted his tools and other personal property valued at $1,000. Appellant asked for compensatory damages on these claims in the amount of $5,500. A reply was filed by appellee denying those allegations.
The matter proceeded to a bench trial on January 28, 1999, at which time appellee testified that he believed his contract had been with Mr. Glenn and that appellant was merely serving as Mr. Glenn's agent. In support of that claim, he proffered copies of checks that had been issued in both of their names for draws during construction.
Appellee also adduced considerable evidence regarding the structural problems with the pole barn. First, he testified that the building was not completed according to specification and that certain "interior walls" were never installed. Second, with respect to the completed portion of the pole barn, appellee asserted that it was so riddled with structural deficiencies as to render it virtually "[u]nusable." He described a number of defects, including the roof, soffits, drywall, etc., but the most severe problem appears to have been with the poles that were used to support the barn. Appellee related that the structure was intended to be built using "twelve [12] foot poles" sunk three (3) feet into the ground. Instead, appellant substituted ten (10) foot poles which he allegedly only sunk six (6) to twelve (12) inches. This resulted in insufficient support for the building, and the building began to sink into the ground thereby putting stress on the remaining structure and causing damage thereto.
Appellee's testimony concerning the alleged defects in the building was corroborated by several other witnesses. Charles Wachenschwanz, a roofer with twenty-one (21) years experience in the construction trade, testified that he was asked to examine the building and he found "the posts sinking, " the "soffit[s] falling down" and the plywood coming loose. In particular, he noted that the roof sheeting was not nailed down correctly and that the shingles did not properly overlap. Mr. Wachenschwanz described the potential damage that this could cause and opined that the building was not constructed in a workmanlike manner.
Similarly, Lou Dunnels (a laborer and carpenter in the construction trade with seven (7) years experience) noted that he had examined the building and found that the sheet metal had not been properly attached to the walls, that the "soffits were in bad shape" and that the building appeared to be "settling." He also explained that posts for a pole barn must "typically" be sunk four (4) feet into the ground and that poles anchored only six (6) inches deep would be subject to moving. Mr. Dunnels concluded that in his opinion, the structure was not built in a workmanlike manner.
Appellee related that in addition to the $51,900 contract price, he expended some $20,000 for materials to shore up the pole barn once construction was finished.[2] He also hired several workers to make repairs to the structure. Peter Tomlin testified that he helped put up a wall and braced some posts to stabilize the building and was paid roughly $640 for his work.[3] Danny Roland testified that he worked approximately 100 hours, and his girlfriend approximately 24 hours, for appellee at $10 per hour to repair drywall and patch the roof.
At the conclusion of appellee's case in chief, appellant moved for a directed verdict arguing that there was no evidence of a contract between the two of them. He cited to the emphatic testimony given by appellee that his contract had been with Mr. Glenn rather than with him. The trial court denied the motion ruling that there was "enough evidence to get beyond [it]."
Mr. Glenn testified on his own behalf and was insistent that there had been no contract between him and appellee. Glenn stated that his rejected proposal ended his direct involvement with the project. Appellant acted on his own behalf when he approached appellee with his building proposal. Mr. Glenn admitted that the checks for construction draws were made payable to both he and appellant and that he had given appellant permission to endorse his signature to those checks. He explained, however, that this was simply to facilitate payment to appellant and that he never made any claim to that money. There was also no evidence introduced below to show that Mr. Glenn ever received any sort of remuneration for the construction project.[4]
Appellant testified on his own behalf and asserted that he had, in fact, satisfied his obligations under the contract despite what was said by his former client. He also claimed that the building was "constructed . . . exactly like [appellee] made [him] construct it." The reason that the building was sinking, appellant continued, was that appellee insisted on building the structure on top of a "spoil bank."[5] He claimed that he tried to warn appellee about the dangers of such construction but was told to build the barn there anyway.
As to his counterclaim, appellant testified that appellee still had not paid him $4,500 that was due and owing under the contract. He further related that he had left some tools and other equipment on the building site but that appellant had seized them, "locked them up," and would not return them. On rebuttal, appellee admitted that he had appellant's tools and declared that he was not going to give them back because he did not "want him [appellant] going out and screwing anybody" else with his construction work.
At the conclusion of trial, appellee moved to dismiss his claim against Mr. Glenn. The motion was granted and the matter was then taken under advisement. The trial court rendered its decision on May 12, 1999 finding in favor of appellee and ordering appellant to pay $21,880 in damages. The trial court found that a construction contract existed between appellant and appellee, and that Mr. Glenn was never a party thereto. Further, after a thorough and detailed recitation of the testimony given at trial, the court determined that the pole barn was not constructed in a "workmanlike manner." The court concluded that "[t]he settling of the building was due to [appellant] improperly installing support poles which were too short." The court awarded appellee damages in an amount equal to the materials bought to repair the building ($20,000) plus the cost of labor ($1,880) for Messrs. Tomlin and Roland, and Mr. Roland's girlfriend, to make those repairs. The court also ordered that appellant's counterclaim for $4,500 due under the construction contract be dismissed. Judgment to that effect was entered and an appeal was taken.
Subsequently, we dismissed the appeal because the trial court did not resolve the second part of appellant's counterclaim (concerning the alleged conversion of his tools and other equipment) or, in the alternative, include an express finding of "no just reason for delay" pursuant to Civ.R. 54 (B). See Simms v. Heskett (Mar. 3, 2000), Athens App. No. 99CA28, unreported.[6] The matter was returned to the trial court and a second judgment was entered on April 19, 2000, finding in favor of appellant on the unresolved counterclaim. The court determined that appellee had wrongfully retained and converted tools and other equipment worth $1,198 and applied an offset to the previously awarded damages. Final judgment in the amount of $20,682 was then entered in favor of appellee and this appeal followed.
 I
Appellant's first assignment of error is directed at the trial court's judgment on appellant's motion for a directed verdict. Appellant cites appellee's testimony that the construction contract had been with Mr. Glenn rather than with him. That being the case, appellant argues, there was no basis to hold him liable for breach of a contract to which he was not a party. He concludes that his motion for a directed verdict should have been granted and that the failure to do so was reversible error. We disagree.
It should be noted at the outset that a Civ.R. 50 motion for directed verdict requires the trial court to determine whether there exists any evidence of substantial and probative value to support the opposing party's case. Hargrove v. Tanner (1990), 66 Ohio App.3d 693, 695,586 N.E.2d 141, 142; Fitzgerald v. Mayfield (1990), 66 Ohio App.3d 298,305, 584 N.E.2d 13, 18. The trial court is required to construe the evidence most strongly in favor of the non-moving party and the motion should not be granted unless reasonable minds could come to but one conclusion and that conclusion is adverse to the non-moving party. SeeClark v. Southview Hosp. Family Health Ctr. (1994), 68 Ohio St.3d 435,438, 628 N.E.2d 46, 48; Wise v. Timmons (1992), 64 Ohio St.3d 113, 116,592 N.E.2d 840, 843; Hawkins v. Ivy (1977), 50 Ohio St.2d 114, 115,363 N.E.2d 367, 368. This requires that the nonmoving party be given the benefit of all reasonable inferences that may be drawn from the evidence. Broz v. Winland (1994), 68 Ohio St.3d 521, 526, 629 N.E.2d 395,399; Blair v. Goff-Kirby Co. (1976), 49 Ohio St.2d 5, 10, 358 N.E.2d 634,637.
A motion for directed verdict tests the legal sufficiency of the evidence, Jaworowski v. Med. Radiation Consultants (1991),71 Ohio App 3d 320, 333, 594 N.E.2d 9, 17; First Fed. Sav.Bank v. WSB Invest., Inc. (1990), 67 Ohio App.3d 277, 281,586 N.E.2d 1159, 1161, and thus the trial court should not weigh the evidence or evaluate the credibility of witnesses. Malone v. Courtyard byMarriott L.P. (1996), 74 Ohio St.3d 440, 445,659 N.E.2d 1242, 1247; Ruta v. Breckenridge-Remy Co (1982),69 Ohio St.2d 66, 68, 430 N.E.2d 935, 838. Given that the determination of Civ.R. 50 (A) motion involves a question of law rather than a question of fact, see Bentley v. Stewart (1992),71 Ohio App.3d 510, 512, 594 N.E.2d 1061, 1062; Kobzav. Gen. Motors Corp. (1989), 63 Ohio App.3d 742, 746,580 N.E.2d 47, 49; Baum v. Augenstein (1983),10 Ohio App.3d 106, 107, 460 N.E.2d 701, 703, appellate courts apply a de novo standard in reviewing the lower court's decision to grant or deny a directed verdict. See Keeton v. Telemedia Co.of S. Ohio (1994), 98 Ohio App.3d 405, 409, 648 N.E.2d 856,858; also see Bennett v. Gearhart (Jun. 17, 1996), Ross App. No. 94CA2073, unreported; Mulford v. Cols. Southern OhioElec. Co. (Jun. 7, 1994), Athens App. No. 92CA1548, unreported. With this in mind, we turn our attention to appellant's motion below and come to the same conclusion as the trial court that enough evidence existed to "get beyond" his request for a directed verdict. Our reasons are as follows.
To begin. appellee's claim that the construction contract was with Mr. Glenn rather than with appellant was always tenuous at best. The written contract names only appellant and appellee as parties to the agreement. No mention is made anywhere in that document of Mr. Glenn and there is no designation of any agency status anywhere in the contract. Thus, we find nothing which would reasonably lead one to believe that appellant executed the agreement on behalf of another principle or anyone else but himself. We acknowledge that this was in fact the testimony of appellee who insisted that Mr. Glenn was a party to the contract. However, the trial court was perfectly justified in discounting that testimony in light of the clear and unambiguous written instrument which showed otherwise.
That aside, however, we also believe that enough direct evidence existed of a contract between appellee and appellant to defeat the motion. Appellant was the first witness called to testify by appellee and he gave the following account of their business relationship:
 "Q. So you talked to Mr. Simms about the building than that, than the building that was originally designed is that right.
A. He doubled it.
Q. But you talked to him about construction of that building.
A. Yes.
 Q. You entered into a contract with him for construction of that building didn't you.
A. Yes sir.
 Q. I am going to show you here what we have had marked here as Plaintiff's Exhibit 1, is that the contract.
A. Yes sir." (Emphasis added.)
In short, appellant admitted that the construction contract had been with him. This was sufficient to survive a Civ.R. 50 motion for directed verdict, regardless of appellee's later testimony that the contract had been with Mr. Glenn. Thus, we find no merit in appellant's argument and we find no error in the trial court's decision to overrule the motion. Accordingly, we overrule appellant's first assignment of error.
 II
We shall jointly consider the second and third assignments of error wherein appellant argues that the trial court's judgment in favor of appellee on both the complaint and the counterclaim was against the manifest weight of the evidence.[7]
Our analysis begins from the standpoint that judgments supported by some competent and credible evidence going to all essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. See Gerijo, Inc. v. Fairfield (1994),70 Ohio St.3d 223, 226, 638 N.E.2d 533, 536; Vogel v. Wells (1991),57 Ohio St.3d 91, 96, 566 N.E.2d 154, 159; C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at the syllabus. This standard is highly deferential and even "some" evidence is sufficient to sustain the judgment and prevent a reversal. Barkley v.Barkley (1997), 119 Ohio App.3d 155, 159, 694 N.E.2d 989, 992; also seeCydrus v. Houser (Nov. 29, 1999), Ross App. No. 98CA2425, unreported;McCormick v. Davison (Nov. 20, 1998), Scioto App. No. 97CA2542, unreported. With these principles in mind, we turn our attention to the evidence adduced below.
Appellee has nearly thirty-eight (38) years experience in the construction business and he testified at trial that the pole barn was improperly built and virtually "unusable." He cited numerous examples in support of that claim (e.g. problems with the roof, drywall, etc.) but the primary construction defect(s) were the support poles that were used and the manner in which they were installed. Appellee explained that the building was constructed using ten (10) foot poles, rather than twelve (12) foot poles, and that those poles were only buried six (6) to eight (8) inches deep in the ground rather than three (3) feet. All this provided inadequate support and caused the building to sink thereby creating further structural problems.
Appellee's position was further bolstered by the testimony of Mr. Wachenschwanz who, with twenty-one (21) years experience in the construction trade, also testified that the building was "constructed wrong." Mr. Wachenschwanz cited numerous problems with the roof, soffits, etc. and focused at length on the poles used to support the barn. He opined that such poles should have been sunk at least thirty-two (32) inches into the ground and should have had eight (8) inches of concrete poured around them. The witness revealed that he had examined the concrete poured around the poles on appellee's barn and found that it was only "an inch, inch and a half, in most areas . . ." Mr. Dunnels, likewise, opined that "very poor workmanship" was involved in the construction of the building. He referred to problems with the soffits and sheet metal used on the walls, and further explained that support poles for the barn should have "[t]ypically" been anchored about four (4) feet into the ground.
The trial court relied on the testimony of these and other witnesses to conclude that the building was not constructed in a "workmanlike manner." We find no error in that conclusion. It is well settled that the law imposes a duty on builders to construct buildings in a "workmanlike manner." See McCray v. Clinton Cty. Home Improvement (1998),125 Ohio App.3d 521, 525, 708 N.E.2d 1075, 1077; Floyd v. United HomeImprovement Ctr., Inc. (1997), 119 Ohio App.3d 716, 719, 696 N.E.2d 254,256; Lin v. Gatehouse Constr. Co. (1992), 84 Ohio App.3d 96, 101,616 N.E.2d 519, 522. A failure to comply with that duty is actionable through a tort claim in negligence. See Gardens of Bay LandingCondominiums v. Flair Builders, Inc. (1994), 96 Ohio App.3d 353, 358,645 N.E.2d 82, 85; Barton v. Ellis (1986), 34 Ohio App.3d 251, 253,518 N.E.2d 18, 20; Benson v. Dorger (1972), 33 Ohio App.2d 110, 115,292 N.E.2d 919, 922; also see Velotta v. Leo Petronzio Landscaping
(1982), 69 Ohio St.2d 376, 433 N.E.2d 147, at paragraph one of the syllabus. The elements of a claim in negligence are generally (1) a duty to perform to a certain standard; (2) a breach of that duty; (3) causation; and (4) damages. See Menifee v. Ohio Welding Products, Inc. (1984), 15 Ohio St.3d 75, 77, 472 N.E.2d 707, 710; Feldman v. Howard
(1967), 10 Ohio St.2d 189, 193, 226 N.E.2d 564, 567. In order to prove that a builder breached his duty to construct in a workmanlike manner, one must demonstrate that the builder acted unreasonably and did not exercise that degree of care which a member of the construction trade in good standing in similar communities would exercise under the same or similar conditions. See Ohio Valley Bank v. Copley (1997),121 Ohio App.3d 197, 205, 699 N.E.2d 540, 545 citing 2 Restatement of Law 2d, Torts (1965) 73, § 299A. The testimony of appellee, Mr. Wachenschwanz and Mr. Dunnels all established that the support poles for the barn should have been anchored several feet into the ground and have had approximately eight (8) inches of concrete poured around them. Their testimony also established that appellant failed to meet these standards in his construction of the building. We therefore conclude that ample evidence exists to support the trial court's finding that the structure was not built in a "workmanlike manner."
Appellant counter argues that there was no breach of duty to construct in a workmanlike manner "because all work was performed under the guidance of [appellee] ." We are not persuaded. First, he cites us no authority of law to support the proposition that a homeowner's "guidance" relieves the builder of his responsibility to use due care in construction. Second, it does not appear to that appellee, in fact, provided any significant "guidance" on constructing the pole barn. Appellant cites numerous portions of the transcript which, allegedly, demonstrate appellee's control and direction over the project. However, it is not at all clear from those excerpts whether that was what was happening in those instances. To the contrary, appellee even testified as follows regarding his involvement in the construction:
 "Q. Okay. Now your provided some in depth testimony as to your involvement in this construction process, is it fair to say that you were there on a day to day basis?
 A. I was in my home there on a day to day basis. I was not on the job on a day to day basis. I was quite ill.
Q. Okay but you were there quite often.
A. Yes sir.
Q. You oversaw the project.
 A. No sir I did not oversee it. I had nothing to do with overseeing the project.
 * * * Q. Okay, so you did maintain some control over the construction process.
 A. I maintained control over the disbursement of the money in this contract." (Emphasis added.)
There is little doubt that appellee was frequently at the job site or that his presence there was an irritant to appellant, if not the entire construction crew. Appellee denied, however, exercising any control or guidance over the construction process and the trial court presumably believed him. We therefore reject appellant's argument that he was relieved of his duty to carry out the construction process in a workmanlike manner or that he could not have breached his responsibilities in that respect.
Appellant also cites his own testimony that he was told to build the barn on a "spoil bank" and that the loose soil conditions caused the building to sink rather than inadequate structural support. Such testimony, however, was contradicted by appellee and his expert witnesses who opined that the sinking was caused by poles which were not adequately anchored into the ground. Further, Mr. Wachenschwanz expressly affirmed that he saw no evidence to substantiate that the damage to the barn was caused by "settling other than the posts sinking" in the ground.
It is axiomatic that the weight to be given evidence and the credibility to be afforded to witness testimony are issues for the trier of fact. Cole v. Complete Auto Transit, Inc. (1997), 119 Ohio App.3d 771,777-778, 696 N.E.2d 289, 293; also see State v. Frazier (1995),73 Ohio St.3d 323, 339, 652 N.E.2d 1000, 1014; State v. Rojas (1992),64 Ohio St.3d 131, 139, 592 N.E.2d 1376, 1384. The underlying rationale for affording such deference to the findings of the trier of fact (in this case, the trial court) is that the trier of fact is better able than an appellate court to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the proffered testimony. Myers v. Garson (1993),66 Ohio St.3d 610, 615, 614 N.E.2d 742, 745; Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273, 1276. It logically follows then that the trier of fact is free to believe all, part or none of the testimony of each witness who appears before it.Rogers v. Hill (1998), 124 Ohio App.3d 468, 470, 706 N.E.2d 438, 439;Thornton v. Parker (1995), 100 Ohio App.3d 743, 751, 654 N.E.2d 1282,1287; Stewart v. B.F. Goodrich Co. (1993), 89 Ohio App.3d 35, 42,623 N.E.2d 591, 596. The trial court in this case simply afforded more weight to the testimony of appellee and his expert witnesses (as to the reason the building was sinking) than it did to the explanation given by appellant. This was within its province and we will not second guess its determination as to matters of weight and credibility of evidence.
Appellant also argues that the trial court's damages award was not supported by the evidence. Specifically, he points to appellee's testimony that he spent $20,000 for materials to shore up the building. Appellant challenges this testimony arguing that appellee failed to present any documentary evidence to support this amount and "even failed to itemize the amounts paid for specific material." We are not persuaded. The absence of any supporting documentation, or itemization of the amounts testified to by appellee, may certainly be a factor when weighing the evidence. Our standard of review, however, is highly deferential and even "some" evidence is sufficient to sustain the judgment and prevent a reversal. Barkley, supra at 159,694 N.E.2d at 992. We find that appellee's testimony, if believed, was sufficient to support the damage award.
Finally, appellant argues that the trial court erred in finding against him on his counterclaim. He cites his testimony that there remained due and owing the sum of $4,500 for work on modifications from the original contract. Appellant continues that "[t]his amount was uncontested by any other testimony in the record" and, thus, the trial court's judgment against him on that issue was against the manifest weight of the evidence. Again, we disagree. The mere fact that evidence is uncontroverted does not, ipso facto, require the trier of fact to accept testimony which is found to lack credibility. See GTE North, Inc. v.Carr (1993), 84 Ohio App.3d 776, 780, 618 N.E.2d 249, 251, at fn. 3;also see State v. Caldwell (1992), 79 Ohio App.3d 667, 680,607 N.E.2d 1096, 1105. The trial court obviously afforded little weight to appellant's testimony on this account and, as stated before, this was well within its province. For these reasons, we find no merit in either the second or third assignment of error and they are accordingly overruled.
Having reviewed all errors assigned and argued in the briefs, and finding merit in none of them, the judgment of the trial court is hereby affirmed.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.
Harsha, J.: Concurs in Judgment Opinion
Kline, P.J.: Concurs in Judgment Only
________________ Peter B. Abele Judge
[1] Mr. Glenn, who represented himself pro se during the proceedings below, actually sent a letter to appellee's counsel wherein he claimed that he "did not enter into a contract with [appellee] ." A copy of this letter was forwarded to the Athens County Clerk of Courts and was, apparently, treated as an answer. We likewise afford it the same treatment on appeal.
[2] Appellee actually testified that he spent $54,000 on the project which included a $2,100 "overcharge" or "overage" above and beyond the contract price. He gave no further explanation of these terms in his testimony and, thus, we disregard them for purposes of our analysis.
[3] Mr. Tomlin further related that he too thought the barn "wasn't built right."
[4] There was evidence that appellant gave Mr. Glenn a check for $500 but this was described as a "finders fee" on the project rather a sharing of profits therein.
[5] A "spoil bank" was described during the proceedings below as "loose dirt" which is taken from one location and deposited in another location, usually "in the coal removing process."
[6] Whenever there are multiple claims in a case, a court may enter final judgment as to one or more but fewer than all claims only upon "an express determination that there is no just reason for delay." Civ.R. 54 (B). Judgments must satisfy this rule in order to be considered final and appealable. See Hitchings v. Weese (1997), 77 Ohio St.3d 390, 391,674 N.E.2d 688; State ex rel. Wright v. Ohio Adult Parole Auth. (1996),75 Ohio St.3d 82, 85, 661 N.E.2d 728, 731; Chef Italiano Corp. v. KentState University (1989), 44 Ohio St.3d 86, 541 N.E.2d 64, at the syllabus. If a judgment is not final and appealable, then an appellate court has no jurisdiction to review it and the case must be dismissed.Prod. Credit Assn. v. Hedges (1993), 87 Ohio App.3d 207, 210,621 N.E.2d 1360, 1362, at fn. 2; Kouns v. Pemberton (1992),84 Ohio App.3d 499, 501, 617 N.E.2d 701, 702.
[7] Appellant also argues that there was insufficient evidence to support these judgments. In a civil case, however, the tests for a sufficiency challenge and a manifest weight challenge are essentially the same.Duvall v. Time Warner Entertainment Co. (Jun. 25, 1999), Hamilton App. No. C-980515, unreported; also seeJ.E.M.L.. Inc. v. Fairview ShoppingCenter Corp. (Nov. 19, 1998), Cuyahoga App. No. 72143, unreported; Urbankv. Urbank (Mar. 1, 1995), Summit App. No. 16752, unreported; Gaines v.Jackson (Aug. 18, 1993), Lorain App. No. 93CA5533, unreported. Thus, we will examine both arguments under the more traditionally used "manifest weight" standard.