This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Plaintiff-Appellant Yvonne Arnott has appealed from a judgment of divorce entered in the Summit County Court of Common Pleas, Domestic Relations Division. This Court affirms.
 I. {¶ 2} Yvonne Arnott ("Wife") and Defendant-Appellee Scott Arnott ("Husband") were married in 1994. One child, Zachary, was born as issue of the marriage in 1995.
 {¶ 3} In September 1999, Wife filed a complaint for divorce. In her complaint, Wife requested that she be named residential parent of Zachary. Husband filed an answer and counterclaim for divorce, requesting shared parenting of Zachary.
 {¶ 4} In November 1999, the trial court entered an order appointing Ms. Catherine James Hoover as guardian ad litem for Zachary. Pursuant to Wife's motion for temporary orders, the court also designated Wife as the residential parent and legal custodian of Zachary and granted Husband supervised visitation for the duration of the pretrial proceedings.
 {¶ 5} In May 2000, Husband filed a motion to terminate supervised visitation. Husband argued that the guardian ad litem had completed a report which recommended the termination of supervised visitation and the commencement of visitation under the court's standard order. Following a pretrial conference held in August 2000, the trial court entered an order establishing a schedule of unsupervised visits. The court also ordered the guardian ad litem to meet with Zachary at least once each month to monitor his progress.
 {¶ 6} Following a pretrial conference in November 2000, the trial court entered an order finding Husband in contempt of court "for leaving [a] Pretrial hearing in an angry, disrespectful manner." The court suspended Husband's visitation privileges until further hearing, and ordered that he continue counseling for his anger. The judgment entry also ordered Husband to meet with Dr. Dawn Lord, a psychologist, to consider how to help Zachary cope with his "separation/visitation anxiety." Approximately one week later, the court journalized an entry ordering that 1) Husband attend weekly anger management sessions with Dr. John Daubney, 2) Dr. Daubney report to the court on the negative impact of Husband's anger on Zachary, and 3) Husband's unsupervised visitation with Zachary be restored.
 {¶ 7} A trial was conducted on the complaint and counterclaim for divorce in January 2001. Pursuant to order of the court, both parties filed post-trial briefs. The court entered a final judgment granting the divorce in April 2001. A qualified domestic relations order providing for the division of a defined contribution plan was entered in September 2002. Wife has timely appealed, asserting three assignments of error.
 II. Assignment of Error Number One "THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO IMPUTE THE APPROPRIATE INCOME TO [HUSBAND]."
 {¶ 8} In her first assignment of error, Wife has argued that the trial court erred by failing to impute more income to Husband for purposes of calculating child support. Wife has contended that Husband's own testimony regarding his hourly wages, records of deposits to his bank accounts, and the income he claimed on an automobile credit application demonstrate that Husband's income was higher than the amount imputed to him by the trial court.
 {¶ 9} "It is well established that a trial court's decision regarding child support obligations falls within the discretion of the trial court and will not be disturbed absent a showing of an abuse of discretion." Pauly v. Pauly (1997), 80 Ohio St.3d 386, 390. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemorev. Blakemore (1983), 5 Ohio St.3d 217, 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621.
 {¶ 10} R.C. 3113.21.5 governs the procedure for calculating and awarding child support in the case at bar.[1] The provisions of that statute are mandatory and must be followed strictly in all material respects, as the overriding concern of R.C. 3113.21.5 is the best interest of the child for whom support is to be awarded. Murray v.Murray (1999), 128 Ohio App.3d 662, 666, appeal not allowed (1999),85 Ohio St.3d 1499, citing Marker v. Grimm (1992), 65 Ohio St.3d 139,141-142. A trial court determines the amount of the obligor's child support obligation in accordance with the child support schedule set forth at R.C. 3113.21.5(D) and the applicable model worksheet at R.C. 3113.21.5(E) or (F). R.C. 3113.21.5(B)(1).
 {¶ 11} An award of child support is based on the obligor's "income," which means:
 "(a) For a parent who is employed to full capacity, the gross income of the parent;
 "(b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent, and any potential income of the parent." R.C. 3113.21.5(A)(1).
 {¶ 12} "Gross income" includes "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes, but is not limited to *** self-generated income; and potential cash flow from any source." R.C. 3113.21.5(A)(2). "`Self-generated income' means gross receipts received by a parent from self-employment, proprietorship of a business, *** and rents minus ordinary and necessary expenses incurred by the parent in generating the gross receipts." R.C. 3113.21.5(A)(3). "Ordinary and necessary expenses incurred in generating gross receipts" is further defined as "actual cash items expended by the parent or the parent's business and includes depreciation expenses of replacement business equipment as shown on the books of a business entity." R.C. 3113.21.5(A)(4)(a).
 {¶ 13} The trial court found that Husband had been employed in various positions at East Ohio Gas from 1988 until 1998, when he was terminated due to a conviction for felonious assault of a police officer. The court determined that Husband then received his plumber's license in 1999 and had since been self-employed as a plumber. To determine Husband's annual gross income, the court first examined Husband's "very detailed [1999] tax return, which reflects on schedule C his gross receipts as a plumber were $28,466.00, with net business income of $7,976.00." The court observed that Husband's net business income for 1999 was computed by subtracting 18 percent of his receipts for the cost of goods sold, and subtracting 22 percent for business expenses, from his gross receipts of $28,466. To calculate Husband's annual business income for purposes of child support, therefore, the court deducted a total of 40 percent from the $44,858.27 in total deposits to his business account during 2000, yielding a net income of $26,915. The court accordingly imputed $26,915 of business income to Husband's plumbing business for purposes of calculating his child support obligation.
 {¶ 14} Wife has argued that the court should have imputed more income to Husband based on Husband's testimony that the hourly rate he charged as a plumber was fifty-five dollars. Based on full-time employment at this rate, Wife has contended, Husband has a potential annual income of over $114,000. Wife has also argued that this higher income figure is consistent with over $55,000 deposited to two of Husband's bank accounts in the first half of 2000.
 {¶ 15} The record, however, does not support Wife's assertion that the trial court should have extrapolated Husband's fifty-five dollar hourly rate over a full time basis to calculate his annual income. Husband testified that fifty-five dollars was his hourly rate, but did not testify that he earned this rate on a full-time (i.e., forty hours per week) basis. Rather, Husband testified that the plumbing business was sometimes busy and sometimes slow, and generally was busier during the summer. Husband also testified that some jobs were billed on a flat fee, rather than an hourly, basis. Husband estimated that his net receipts from his plumbing employment in 2000 would be between $12,500 and $12,700. Husband also testified that his gross receipts from his plumbing business in 1999 were $28,466, and he anticipated that his gross receipts in 2000 would be approximately twenty-five percent higher. In addition, Husband had back surgery immediately before the trial, which he testified would incapacitate him for eight to ten weeks. In light of all the foregoing, we cannot conclude that the trial court abused its discretion in refusing to impute a full time wage of fifty-five dollars per hour for purposes of calculating Husband's child support obligation.
 {¶ 16} Wife has next asserted that the trial court should have imputed $36,500, the gross income Husband claimed for 1999 on an application for credit to purchase an automobile, plus the twenty-five percent by which Husband estimated his 2000 gross receipts would exceed his 1999 receipts. Husband testified, however, that his gross receipts for 1999 were $28,466, and that he inflated his estimate on the credit application in order to be approved for the loan. Based on Husband's testimony and 1999 income tax return, the trial court found that Husband's 1999 gross receipts as a plumber were $28,466. Again, we cannot find that the trial court abused its discretion in failing to impute income to Husband based on his inflated estimate on the automobile credit application.
 {¶ 17} Finally, Wife has argued that the trial court should have imputed potential income to Husband pursuant to R.C. 3113.21.5(A)(1) because he was voluntarily underemployed. R.C. 3113.21.5(A)(5)(a) provides that potential income for a parent that a court determines to be voluntarily underemployed includes:
 "Imputed income that the court *** determines the parent would have earned if fully employed as determined from the parent's employment potential and probable earnings based on the parent's recent work history, the parent's occupational qualifications, and the prevailing job opportunities and salary levels in the community in which the parent resides[.]"
 {¶ 18} "[T]he question whether a parent is voluntarily (i.e., intentionally) unemployed or voluntarily underemployed is a question of fact for the trial court. Absent an abuse of discretion, that factual determination will not be disturbed on appeal." Rock v. Cabral (1993),67 Ohio St.3d 108, 112. An abuse of discretion connotes more than an error of law or judgment, but implies that the judgment can be characterized as unreasonable, arbitrary, or unconscionable. Blakemore,5 Ohio St.3d at 219.
 {¶ 19} In the divorce decree, the court noted that Husband was employed by East Ohio Gas from 1988 until 1998, when he was terminated as a result of his conviction for felonious assault of a police officer. The trial court found that Husband, who is undergoing treatment for a bipolar condition, obtained his plumber's license in 1999. The court further observed that it "was impressed with [Husband's] positive work attitude and thinks he is trying very hard to earn a good income." Wife has failed to demonstrate that the trial court abused its discretion in finding that Husband was not voluntarily underemployed, and the court therefore did not err in failing to impute potential income to Husband pursuant to R.C. 3115.21.5 (A)(1)(b).
 {¶ 20} Wife's first assignment of error is without merit.
 Assignment of Error Number Two "THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THE OPPENHEIMER ACCOUNTS WERE SEPARATE PROPERTY."
 {¶ 21} In her second assignment of error, Wife has argued that the trial court erred in awarding certain Oppenheimer investment accounts to Husband as his separate property. Wife has contended that marital funds contributed to the Oppenheimer accounts, and Husband failed to trace the assets in the accounts to his separate property.
 {¶ 22} R.C. 3105.17.1(A)(3)(a) provides that marital property includes all real or personal property, or all interest that either or both spouses has in real or personal property, acquired by either or both spouses during the marriage. Marital property also includes "income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage[.]" R.C. 3105.17.1(A)(3)(a)(iii). Separate property, on the other hand, includes all real and personal property and any interest in real or personal property that was acquired by one spouse prior to the marriage, and passive income and appreciation acquired from separate property by one of the spouses during the marriage. R.C. 3105.17.1(A)(6)(a)(ii) — (iii).
 {¶ 23} Under R.C. 3105.17.1(B), a trial court must classify property as marital or separate before such property can be awarded in a divorce proceeding. A trial court's characterization of property as either marital or separate is a determination that must be supported by competent, credible evidence. Barkley v. Barkley (1997),119 Ohio App.3d 155, 159; see, also, Spinetti v. Spinetti (Mar. 14, 2001), 9th Dist. No. 20113, at 7. This standard of review "is highly deferential and even `some' evidence is sufficient to sustain the judgment and prevent a reversal." Barkley, 119 Ohio App.3d at 159. As the trial court is best able to observe the demeanor, gestures, and voice inflections of the witnesses, and to use those observations to weigh the credibility of the proffered testimony, this Court is guided by a presumption that the findings of the trial court are correct. Id., citingIn re Jane Doe 1 (1991), 57 Ohio St.3d 135.
 {¶ 24} Furthermore, "[t]he commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.17.1(A)(6)(b). The party seeking to have the commingled property deemed separate has the burden of proof, by a preponderance of the evidence, to trace the asset to his or her separate property. Modon v. Modon (1996), 115 Ohio App.3d 810, 815, appeal not allowed (1997), 78 Ohio St.3d 1442; West v. West (Mar. 13, 2002), 9th Dist. No. 01CA0045, at 11-12.
 {¶ 25} The divorce decree in the case sub judice disposed of three Oppenheimer investment accounts: a "Global," a "Strategic," and a "Discovery Fund" account. The court awarded the Global and Strategic accounts in their entirety to Husband as his separate property. The court also distributed seventy-seven percent of the Discovery Fund account to Husband as his separate property, and designated the remaining twenty-three percent of the Discovery Fund as marital property, to be divided equally.
 {¶ 26} At trial, Wife testified that all three Oppenheimer accounts were in Husband's name. Wife also testified that she and Husband contributed one hundred dollars per month from a joint checking account, which included income earned by both parties, to the Oppenheimer accounts. Wife averred that the contributions from the joint account were transferred automatically at the beginning of every month. Wife identified ledger entries recorded in transaction registries for the joint account from 1996 to 1998, in which the parties recorded the automatic transfers in order to maintain their account balance. Wife testified that she and Husband made the monthly one hundred dollar transfers from the beginning of their marriage in October 1994 until they finally separated in September 1999.
 {¶ 27} Based on her testimony that the parties made deposits to the Oppenheimer funds from a joint checking account, Wife has asserted that Husband bears the burden of tracing all holdings in the accounts to his separate property. However, Husband presented evidence that the parties' monthly deposits of one hundred dollars went only to the Global account, and there was therefore no commingling of separate and marital funds with respect to the Strategic and Discovery Fund accounts. Husband stated that he owned all three accounts prior to the marriage, and no funds were contributed to the Discovery Fund and Strategic accounts during the marriage.[2] The only growth in these accounts, Husband testified, was from dividend reinvestment of his premarital holdings. In support of his contention, Husband identified statements from each of the Oppenheimer accounts from 1994 through the end of the parties' marriage. Both Husband's testimony and the account statements show that the only transactions during this time regarding the Strategic and Discovery Fund accounts were dividend reinvestments of Husband's premarital assets. Husband's testimony and the account statements demonstrated that Husband owned 439.581 shares in the Discovery Fund account as of December 1994, and 574.425 shares as of April 2000. Accordingly, the court awarded 439.581 shares, the amount owned by Husband prior to the marriage, to Husband as his separate property, and distributed the remaining 134.844 shares as marital property.
 {¶ 28} Upon review of the record as a whole, we must conclude that Wife has failed to show that the trial court's apportionment of the Oppenheimer accounts into separate and marital components is not supported by competent, credible evidence. Wife's second assignment of error is not well taken.
 Assignment of Error Number Three "THE TRIAL COURT ABUSED [ITS] DISCRETION IN FAILING TO TERMINATE THE OVERNIGHT VISITS."
 {¶ 29} In her third assignment of error, Wife has argued that the trial court erred in failing to terminate overnight visitations between Husband and Zachary. Wife has argued that the evidence adduced at trial demonstrated that continued overnight visits were not in Zachary's best interests, and that the court "had already made up its mind as to what to do regarding the visitation" before Husband could elicit testimony regarding Zachary's best interest.
 {¶ 30} This Court reviews a trial court's determination of visitation rights under an abuse of discretion standard. Shannon v.Shannon (1997), 122 Ohio App.3d 346, 350. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore,5 Ohio St.3d at 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons,66 Ohio St.3d at 621.
 {¶ 31} In adjudicating visitation rights, the trial court must exercise its discretion in a manner that best protects the interest of the child. In re Whaley (1993), 86 Ohio App.3d 304, 317. R.C. 3109.05.1(A) provides:
 "If a divorce *** proceeding involves a child and if the court has not issued a shared parenting decree, the court *** shall make a just and reasonable order or decree permitting each parent who is not the residential parent to visit the child at the time and under the conditions that the court directs, unless the court determines that it would not be in the best interest of the child to permit that parent to visit the child[.]"
 {¶ 32} R.C. 3109.05.1(C) directs that a trial court's determination as to a non-residential parent's visitation rights shall be guided by the factors set forth at R.C. 3109.05.1(D). These factors include:
 "(1) The prior interaction and interrelationships of the child with the child's parents[;]
"***
 "(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;
"(4) The age of the child;
"(5) The child's adjustment to home, school, and community;
" ***
"(7) The health and safety of the child;
" ***
"(9) The mental and physical health of all parties;
" ***
 "(15) Any other factor in the best interest of the child." R.C. 3109.05.1(D).
 {¶ 33} The trial court was presented with extensive testimony throughout the course of pretrial proceedings and during the two-day trial regarding visitation and the best interests of Zachary in developing a schedule of overnight visitation with Husband. In its final judgment, the court preserved the pretrial visitation schedule, pursuant to which Husband saw Zachary every Wednesday evening and every Sunday, with an overnight visit on every other Sunday. The court ordered that the foregoing schedule be maintained until an additional review hearing could be held, at which time the court would determine when it would be in Zachary's best interest to increase Husband's visitation time. The court then stated: "The goal is that Zachary have additional overnight parenting times with [Husband]. It is expected that Zachary have quality time with [Husband]." The court thereafter made detailed findings of fact with respect to the factors set forth at R.C. 3109.05.1(D).
 {¶ 34} Wife has argued that the trial court erred by not terminating the overnight visits because it was "undisputed that Dr. Lord recommended at trial that the overnights be suspended." Dr. Lord was a psychologist with whom the court ordered Husband and Zachary to meet in order to identify the cause of Zachary's anxiety, but the court repeatedly expressed frustration with Dr. Lord's lack of cooperation and unfamiliarity with the parties' situation. Moreover, Dr. Lord testified that "my recommendation isn't to terminate but make [the overnight visits] more gradual[.]" Dr. Lord further explained that the visits should continue but should be more structured:
 "My recommendation is not to terminate [Husband's visits], but to gradually make them where [Zachary] can — where he has a better relationship with [Husband] and he better knows what is going to occur, to go more smoothly or tie it to the success of the visit, but I have no problem and I think it would be good to increase visits but of a structured quality."
 {¶ 35} In addition to Dr. Lord's recommendations, the court considered the testimony of Ms. Hoover, the guardian ad litem, who observed Zachary during visits with both parties and frequently provided transportation for Zachary to and from the visits. Ms. Hoover recommended that the standard order of visitation between Zachary and Husband should be implemented. The court also considered the testimony of Christine VanDorsten, the family court services evaluator, who met with Husband and Wife as well as with Ms. Hoover and Dr. Lord to assess the progress of Zachary and the parties. Ms. VanDorsten also recommended the continuation of Husband's visits with Zachary.
 {¶ 36} Having thoroughly reviewed the record, we cannot conclude that the trial court abused its discretion in failing to terminate Husband's overnight visits with Zachary. Wife's third assignment of error must fail.
 III. {¶ 37} Wife's assignments of error are overruled. The judgment of the trial court is affirmed.
BAIRD, P.J. and BATCHELDER, J. CONCUR.
[1] R.C. 3113.21.5 was repealed and replaced by R.C. 3119.01, et seq., effective March 22, 2001. See Am.Sub.S.B. No. 180. However, this Court reviews the calculation and award of support based on the statute in effect at the time Wife filed her complaint for divorce. See Williams v.Williams (1992), 80 Ohio App.3d 477, 482.
[2] At trial, Husband identified the Global account as the sole account to which the monthly one hundred dollar deposits from marital funds were made. The account statements admitted into evidence at trial support Husband's testimony that the monthly contributions were deposited into the Global account. In his post-trial brief, however, Husband asserted that the monthly deposits were made to the Discovery Fund account, and the trial court allocated the marital contributions to the Discovery Fund account in dividing the property. Neither party has argued that any misidentification of the Global and Discovery Fund accounts constitutes reversible error, however. Wife has simply asserted that she "should be entitled to share in the total funds based on [Husband's] failure to trace[,]" because "[i]t is undisputed by either party or their counsel that [Wife] contributed from her marital funds towards" all three Oppenheimer accounts. Consequently, we will address only Wife's argument that she is entitled to a marital share in all three Oppenheimer accounts based on Husband's failure to trace, and we will not further address any misidentification of the individual accounts.