DECISION AND JOURNAL ENTRY
{¶ 1} Plaintiff-Appellant/Cross-Appellee Liberty Excavating, Inc. has appealed from a decision of the Summit County Court of Common Pleas that entered judgment in favor of Defendant-Appellee/Cross-Appellant Welty Building Company, Ltd. on its counterclaim. Defendant-Appellee/Cross-Appellant Welty Building Company, Ltd. has filed a cross appeal. This Court affirms in part, and reverses in part.
 I {¶ 2} On November 2, 2001, Plaintiff-Appellant Liberty Excavating, Inc. ("Liberty") filed suit against Defendant-Appellee Welty Building Company, Ltd. ("Welty") for breach of contract and fraud.[1] In the complaint, Liberty alleged that the parties entered into a subcontract on July 23, 1998, for Liberty to perform "earth work" and "site utility" work on behalf of Welty. Liberty claimed that it substantially performed all the material terms of the subcontract, but that Welty breached the terms of the subcontract by failing to pay Liberty for the work completed. Liberty alleged that there remained an outstanding overdue balance in an amount in excess of $25,000 for work it performed under the subcontract.[2]
Liberty further alleged that Welty fraudulently induced Liberty to do additional work by falsely promising Liberty it would be paid the overdue monies owed under the subcontract. Liberty claimed that in reliance upon these promises, it suffered damages in excess of $25,000.
 {¶ 3} Welty filed an answer and counterclaim on December 21, 2001. As one of the many defenses asserted by Welty in its answer, Welty alleged that Liberty was barred from asserting a breach of contract claim because of its own breach of contract. In its counterclaim, Welty further alleged that as a result of Liberty's breach of contract, it was "damaged in an amount that cannot yet be reasonably determined, inasmuch as the work for which [Liberty] contracted Welty has not yet been completed."[3] Liberty replied to Welty's counterclaim. The matter proceeded to a bench trial after many attempts to mediate the issues.
 {¶ 4} After hearing testimony from Delores Kavocic, David Berger, Donzell Taylor, and James Regan, the trial court granted judgment in favor of Liberty in the amount of $83,196 on its complaint. The trial court also granted judgment in favor of Welty in the amount of $40,306 on its counterclaim. The trial court's conclusions were based on the following findings of fact. In 1998, Welty was awarded a contract with the Veteran's Association ("VA") to construct and develop a new National Cemetery located in Rittman, Ohio ("VA project"). Welty then subcontracted with Liberty to perform certain specified earth work and site utilities. The trial court found that "[t]he subcontract also provided that Liberty was only entitled to compensation for work it performed necessitated by acts or omissions of other subcontractors to the extent Welty was paid by the VA on account of such failure." The subcontract further provided that the terms and conditions could be varied, but such variations would only be binding upon the parties by a writing signed by the contractor. During the course of construction, Welty requested Liberty to perform extra work, over and above the original subcontract value of $2,147,000. The "extra work" was followed by a "writing signed by the contractor," in which Welty agreed to take the risk of paying Liberty for any outstanding quotes in the absence of prior approval by the VA of the quotes. The trial court found that the outstanding balance Welty owed Liberty as of August 3, 2001, amounted to $83,196 and that Welty was legally obligated to pay Liberty that amount, subject to Liberty's completion of the punch list items. The trial court granted judgment in favor of Liberty in the amount of $83,196.
 {¶ 5} The trial court further found that Liberty failed to complete the punch list items and that Welty sent Liberty a letter on October 17, 2001 that provided Liberty with 72 hour notice regarding its failure to complete those items. Despite receiving the notice, Liberty did not complete the punch list items and Welty terminated the subcontract. Welty was then forced to hire another subcontractor, Kiehl Excavating, Inc. ("Kiehl"), to complete the punch list items; at the time of trial, Kiehl was in the process of completing those items at an estimated cost of $13,250. With regard to the back charges Welty assessed against Liberty, the trial court specifically found that other subcontractors were hired to repair or complete: 1) extra seeding, "cutting and patching," which was completed by Richfield Landscape Contractors, Inc. ("Richfield"); 2) the resetting of sprinkler heads, which was completed by S M Irrigation ("S 
M"); and 3) crypt damage, which was repaired by Lindsay Concrete Products, Inc. The trial court found that the value of the work performed by the replacement subcontractors was $27,056, and that Welty validly assessed this cost against Liberty as back charges pursuant to Article 6 of the subcontract. The trial court awarded Welty $13,250 for punch list items Liberty failed to complete and $27,056 in "back charge damages." The trial court deducted $7,480 from the total amount awarded in Welty's counterclaim for the final retainage amounts still being withheld against Welty by the VA; Welty conceded in its post-trial brief that Liberty was owed the $7,480. As a result, the trial court awarded Welty $32,826 in damages. After set-off of Welty's counterclaim award in the amount of $32,826 against Liberty's award in the amount of $83,196, Liberty was granted judgment in the amount of $50,370.
 {¶ 6} Liberty has timely appealed, asserting three assignments of error. We have consolidated Liberty's first and second assignments of error for ease of analysis. In addition, Welty has asserted one cross-assignment of error.
 II Assignment of Error Number One
"The trial court committed prejudicial error in awarding * * * [Welty] a set-off of $27,056 in claimed backcharges."
 Assignment of Error Number Two
"The trial court committed prejudicial error in awarding [Welty] a set-off of $13,250 for `punchlist' work."
 {¶ 7} In Liberty's first and second assignments of error, it has argued that the trial court erred when it awarded Welty damages for back charges and uncompleted punch list items.
 {¶ 8} This Court will not reverse a trial court's judgment so long as it is supported by competent, credible evidence going to all of the essential elements of the case. C.E. Morris Constr.Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 280; see, also, Wallick Enters. v. Loran Metro. Hous. Auth., 10th Dist. No. 01AP-1383, 2002-Ohio-3855, ¶ 12; Gillard v. Green (Dec. 28, 2001), 4th Dist. No. 00CA54, 2001 Ohio App. LEXIS 6019, *11. "This standard is highly deferential and even `some' evidence is sufficient to sustain the judgment and to prevent a reversal."Barkley v. Barkley (1997), 119 Ohio App.3d 155, 159. Therefore, this Court does not decide whether it would have come to the same conclusion as the trial court. Rather, this Court is required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate factual conclusions. We are guided by the presumption that the trial court's factual findings are correct because the trial judge "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal v. Cleveland (1984), 10 Ohio St.3d 77,79.
 {¶ 9} At trial, the following witnesses testified: Delores Jane Kovacic ("Kovacic"), Donzell S. Taylor ("Taylor"), James Regan ("Regan"), and Dave Berger ("Berger"). Kovacic testified that she, along with her now deceased husband, started the company known as Liberty Excavating, Inc. As a co-owner of Liberty, Kovacic "[m]ostly [did] the book work and accounting * * *." The only agents of Liberty that dealt directly on billing issues with the VA or Welty was Kovacic's husband, Clifford, and Berger. As the records custodian of the company's records, Kovacic was able to verify that Liberty's exhibits were records maintained during the normal course of business. Reading from Liberty's exhibits, specifically Exhibit 18, Kovacic stated that Welty owed Liberty $105,249.79 for extra work Liberty completed and $33,877 for work still owed under the original written subcontract. She admitted on cross-examination, however, that she did not know the scope of work Liberty was required to perform under the subcontract; therefore, she could not say that the work Liberty performed was pursuant to the subcontract or whether the work was extraneous to the subcontract. Kovacic further testified that Liberty had not been back to the VA project since September 2001.
 {¶ 10} Taylor, the owner of Welty, was called by Liberty as a witness. Taylor explained that he owned Welty for approximately three and a half years. He stated that Welty entered into a contract with VA for the construction of a Vietnam Veterans memorial site. The cost of the contract was originally for $11 million dollars, but at the time of trial the cost of completion had exceeded $14 million dollars. Taylor further explained that Liberty was hired in July 1998 and its main responsibility as a subcontractor was "excavation and site utilities[.]" Taylor stated that Liberty began work in July 1998 and worked through the summer of 1999 and into the early summer of 2000. He stated that he was not responsible for monitoring Liberty's progress on the VA project. Two of Welty's employees, Ed DeHoff ("DeHoff"), job superintendent, and Regan, project manager, were responsible for reviewing Liberty's progress at the VA project.
 {¶ 11} Taylor testified that after Liberty had substantially completed its work, Liberty was paid the original contract "retainage" in June 2000. The term "retainage" was defined as payment received by a subcontractor after the subcontractor submits the required paperwork to the prime contractor, in this case Welty, to show its progress on the job. The prime contractor then evaluates the completed work and releases the funds to the subcontractor under the original contract. When the subcontractor reaches substantial completion of its original job, the retainage is released; however, some of the funds are held back for completion of punch list items.
 {¶ 12} Taylor testified that after Liberty received its retainage in June 2000, a representative of the VA, Mark Eney ("Eney"), personally inspected the project site and identified those items, referred to as "punch list items," the he believed needed to be repaired, replaced, or corrected. Eney then created a list of "punch list items" and passed the list on to Welty in order that Welty could address the punch list items. Taylor testified that Regan, the project manager, indicated to him in the summer of 2001, that Liberty had some concerns or disputes over payment/nonpayment of the work it had already completed under the contract. Taylor explained that "Regan brought to [his] attention that he had sat down or had discussions with [Liberty] on several occasions trying to get [Liberty's] records to match [Welty's] records but [Regan did] not indicate to [Taylor] that there was a major dispute[.]" A private meeting between Berger, the general manager with Liberty, and Taylor was held in the summer of 2001, almost fourteen months after Liberty had substantially completed the job. Taylor explained that the purpose of the meeting was to resolve punch list items and "to get Liberty mobilized to come back and finish the punch list." The two men also discussed change orders under the subcontract. Taylor further explained:
"Liberty not performing their punch list was causing Welty a problem in [its] dealings with Mark Eney and [Welty was] having extreme difficulty in getting any of the change orders on the project reviewed fairly because [Welty] not getting performance from [its] subcontractor to correct the punch list. * * * [Welty] had other change orders for other contractors on the project that were being held up or we were being penalized because of Liberty's lack of performance."
 {¶ 13} Taylor testified that after the meeting with Berger, he sent Berger a letter memorializing the contents of their meeting. The letter, dated August 3, 2001 ("August 3, 2001 letter"), stated:
"Per our discussion today, [Liberty] will mobilize on the 13th of August with a four or five man crew, and take one week to complete the Punch List. * * * Upon completion of your Punch List work and acceptance by * * * Mr. Eney, we will settle and pay your account, with [Welty] taking the risk on final settlement with the VA of outstanding quotations."
 {¶ 14} Taylor explained that the purpose of the letter was "to document the agreement that [Liberty and Welty] had in that meeting, which was that [Liberty] had one week's worth of work that [it] would complete starting on [August 13, 2001]."
 {¶ 15} Taylor admitted during cross-examination that he did not have firsthand knowledge of the work Liberty completed from the summer of 2000 to the summer of 2001. Based upon what his employee, DeHoff, told him, he was aware that after Liberty received the August 3, 2001 letter, Liberty returned to the VA project in September 2001 to complete some of the punch list items. Taylor stated that his "recollection was that [Liberty] showed up somewhere between a week and two weeks later than the commitment in [the August 3, 2001] letter." Taylor stated that although Liberty showed up to complete the punch list items after August 13, 2001, Liberty was never told not to proceed with completion of the punch list items. Taylor also agreed that Liberty substantially completed some of the punch list items, which reduced the outstanding balance for punch list items from $60,169 to $12,275. When asked "if Liberty's punch list items were ever finalized by Liberty[,]" Taylor responded:
"My recollection is it's been represented to me it has not been completed. * * * Let me say it in a different way. It has not been accepted by Mark Eney. There may be — there may have been an attempt to complete it, but it has not been accepted to Mark Eney's satisfaction."
 {¶ 16} Taylor further stated that after the August 3, 2001 letter was sent he was informed by Regan that Welty did not owe Liberty for the punch list items it completed in September 2001 because Liberty had been overpaid. As a result, Liberty was never paid for the completed punch list items. Taylor further admitted that he was aware that the reason Liberty did not return to the VA project to complete the remaining punch list items was because it was never compensated for the punch list items that were completed in September 2001.
 {¶ 17} Another letter, written by Regan and dated October 17, 2001, was sent to Liberty as a result of its failure to complete the remaining punch list items. The letter, which was faxed to Liberty on October 18, 2001, at 2:27 p.m., stated:
"In accordance with [Liberty's] Subcontract Agreement Article 12, [Liberty is] hereby notified that you have 72 hours to resume completion of your Punch List Work and to complete all Punch List work with promptness and diligence. Failure on your part to do so will result in [Welty] terminating [Liberty's] Subcontract in accordance with Article 12."
 {¶ 18} Article 12 of the subcontract provides, in pertinent part:
"Should [Liberty] at any time refuse or neglect to supply a sufficient amount of skilled workmen or materials of the proper quality or quantity, or fail in any respect to perform the Work with promptness and diligence, or cause by any action or omission the stoppage or delay of or interference with the work of Contractor or of any other subcontractors on the Project, or fail in the performance of any of the agreements on its part contained herein or become bankrupt or insolvent or go into liquidation either voluntary or under an order of a court of competent jurisdiction or make a general assignment for the benefit of creditors or otherwise stop the Work or evidence financial incompetence (all as determined by [Welty] in its discretion), if said default is not cured to the satisfaction of [Welty], in its discretion, after 72 hours written notice to [Liberty], mailed or delivered to the last known address of the latter, [Welty] may:
"(a) provide through itself or through others, any such labor or materials necessary to perform the Work until, in the sole judgment of [Welty], the deficiencies of [Liberty's] Work have been corrected, and deduct the cost thereof from any money due, or thereafter otherwise to become due [Liberty] under this Agreement, or
"(b) terminate this Agreement * * *." (Alterations added.)
 {¶ 19} Taylor referred to the letter as "a last ditch effort to make sure the subcontractor [understood] the seriousness of the work that needed to be completed." According to Taylor, Liberty did not return to the VA construction site to complete the punch list items after the October 17, 2001 letter was sent, and the subcontract was subsequently terminated.
 {¶ 20} Regan, a Welty employee, also testified at trial. Welty, he explained, was a "construction manager, general contractor. Construction management consists of negotiating contracts to build buildings * * *. [W]e build a construction project for the owners, manage projects as general contractors such as we were on the VA cemetery." He further explained that he was employed with Welty as the "Chief estimator" and was the project manager for the VA project. His job as project manager required him to:
"[P]ut the bid together, submit the estimate to the VA, and then [he] negotiated all the subcontracts and all the agreements with the subcontractors, in essence, purchasing the entire project. [H]e was responsible for all the paperwork, which included shop drawing approvals required by the VA and change orders and the like, all paperwork on the job."
 {¶ 21} As the "numbers cruncher" for the VA project, Regan rarely visited the construction site to monitor a subcontractor's progress. Regan admitted that in the summer of 2000 a disagreement arose between Liberty and Welty over "a bunch of quotations and invoices, and the like." During Taylor's testimony, Welty's trial counsel presented two documents for Taylor to review. The documents indicated that Liberty was assessed back charges in the amount of $27,056.35 for work that Liberty was required to complete, but which was completed by other subcontractors hired by Welty. The documents were: 1) an invoice sent to Liberty on July 2, 2001, a day after Taylor and Berger held a private meeting to discuss any discrepancies in payment; and 2) an invoice dated November 12, 2002, which summarized recent back charges assessed against Liberty. On direct examination, Regan explained that Welty had the right to assess back charges against Liberty pursuant to Article 6 of the subcontract. Article 6 provided, in pertinent part:
"In addition to its other remedies, [Welty] may withhold and retain from time to time out of monies due [Liberty] hereunder, amounts sufficient as determined by the Contractor in its discretion to fully reimburse and compensate itself for any loss or damage which it sustains, or may sustain, as a result of any default or any breach of any of the provisions of this Agreement by [Liberty]." (Alterations added.)
 {¶ 22} Regan testified that the above provision meant that "if a subcontractor is not performing, [Welty has] the right to get work done for the subcontractor and charge them with the cost."
 {¶ 23} Regan explained that Liberty was initially assessed back charges in the amount of $10,133.73 in March 13, 2001, for work Liberty failed to complete in the year 2000. Regan further explained that the amount of back charges assessed against Liberty increased from $10,133.73 in March 2001 to $26,056.53 in November 2002, because:
"[S]ome of [the back charges] occurred because those were quotes I gave to the VA because [Welty] thought [it was] entitled to get paid for [those quotes] * * *. Eventually that got rejected and finally determining exactly what happened there, was trying to determine that was Liberty's responsibility, so it was added to the list."
Regan admitted that he had "no knowledge as to the validity of a back charge against Liberty for purportedly damaging something on the job site. That would only be something [he] got secondhand from [DeHoff]."
 {¶ 24} With respect to the work completed by Richfield, Regan agreed that "there's nothing as far as Liberty ever being put on prior notice that [Welty had] Richfield come out to do this work, and there's nothing [in writing] anywhere giving Liberty first opportunity to go do the work itself before it gets back charged by [Welty] for Richfield's work." Regan further stated that he was not aware of Liberty receiving notice regarding corrections or completions performed by Richfield.
 {¶ 25} Regan discussed the back charges assessed against Liberty as a result of work completed by S M. Regan admitted that he could not say with any certainty why Liberty was back charged for the work performed by S M. He further explained that DeHoff generally made the decision of which subcontractor was back charged. As to the 72 hour notice Welty was required to give Liberty before it called in S M to repair or correct the work Liberty should have completed, Regan was asked: "As far as you recall, on any of these invoices [submitted by S M] there was never an opportunity given to Liberty to go out, see it, make a determination as to whether it was legitimately their responsibility and, if so, correct it without getting hit with a back charge back first?" Regan responded: "Not that I know of, no."
 {¶ 26} Regan also discussed the punch list, which was attached to the October 17, 2001 letter. The list indicated that the value of punch list items Liberty had to complete before Welty terminated the contract was $11,450; this value reflected the punch list items that remained to be completed after Liberty returned to the VA project to complete the punch list items in September 2001. Regan further explained that even after Liberty was sent the October 17, 2001 letter, and after the subcontract was subsequently terminated, Welty did not hire a replacement subcontractor to complete the punch list items until a year after the letter was sent. Regan stated that another subcontractor, Kiehl, was later hired to complete the punch list items. However, Regan admitted that he could not produce any invoices to show that Kiehl had completed the punch list items. Regan further admitted that the value of Kiehl's services to complete the punch list items would be less than the cost Welty assessed to Liberty for completion of the punch list items.
 {¶ 27} Regan also recalled that he had a conversation with Berger in September 2001, in which Berger told him that if Welty was not going to pay for work Liberty had already completed then Liberty would not return to the VA project to complete the remaining punch list items.
 {¶ 28} Berger, a Liberty employee at the time Liberty was performing work on the VA project, testified on behalf of Liberty; at the time of trial, Berger was no longer an employee of Liberty. From 1998 to 2001, Berger was employed with Liberty as a general manager. Berger acted as a contract manager on the VA project and he was responsible for contract coordination, billing, and materials ordering. He maintained continuous contact with DeHoff and Regan. Berger testified that in October 2001 he had a discussion with Regan concerning whether or not Liberty would return to the VA project to complete the remaining punch list items. He testified that "[t]here was a phone call from [Regan] to [Liberty's] office requesting [Liberty] to remobilize, and * * * it was made clear that no further payment was going to be made until the punch list was totally complete." Berger admitted that he was upset after the conversation with Regan and that he refused to have Liberty return to the VA project to complete the remaining punch list items. He "felt that over the duration up to that point [Liberty] had done everything possible to satisfy [its] contract requirements and went above and beyond and just [was] not getting the same cooperation back from Welty."
 {¶ 29} Berger stated that he believed Welty's refusal to pay Liberty for work it had completed, even after Liberty had returned to the construction site in September 2001 to complete some of the punch list items, was in direct contravention to the August 3, 2001 letter. Berger explained: "[I] [c]ouldn't understand why if Don Taylor put into writing what [Liberty] needed to do, why then [was Welty] not following through with payment." Berger further testified, as did Taylor, that the August 3, 2001 letter was based upon a meeting he had with Taylor regarding unpaid invoices. Berger testified that the meeting was cordial and it ended with Taylor stating that he would pay Liberty the dollar value on the punch list and outstanding quotes. Berger testified that the language contained in the August 3, 2001 letter meant that "[Welty] would settle and pay [Liberty's] account. The account is the dollar value on the punch list of, at that time it was, * * * $50,000, and taking the risk of final settlement of outstanding quotations. That dollar value at that time was $84,000."
 {¶ 30} Berger discussed the back charges assessed to Liberty for: the removal of weeds and debris completed by Richfield in preparation of the flag post; the repair of irrigation system completed by S M; and crypt damage. Berger stated that Richfield, as a "seeding contractor on the VA project," was responsible for seeding, landscaping, and tree planting. Berger explained that Richfield was "to take [Liberty's] work, once the topsoil, amended topsoil or topsoil is respread, [Richfield] picks that area up and performs [its] seeding operation." Berger testified that some of the back charges relating to seeding and replacement of topsoil were not the fault of Liberty, but the fault of S M. S M, he explained, was behind in installing irrigation lines in the fall of 1999. As a result of S M's failure to complete work in a timely fashion, Richfield was delayed in seeding the topsoil. Because Richfield could not seed the topsoil Liberty had previously laid down, "severe rutting of the site" occurred in the winter of 1999. Berger testified that Welty was aware that S M's delay aided in the winter soil erosion. Due to the degraded condition of the topsoil, Welty ordered Liberty to put down more topsoil in the spring of 2000. Berger testified that DeHoff promised to pay Liberty for this work.
 {¶ 31} With regard to the remaining back charges for work Richfield and S M completed to "prepare and seed utility lines" and "cut patch," Berger testified that he told DeHoff that Liberty was not responsible for the work completed by S M. Berger also told DeHoff that Liberty was not responsible for the seeding completed by Richfield. Berger stated that DeHoff understood that Liberty was not responsible for the work that Richfield completed. Berger also stated that Liberty was never given 72 hour notice for the work Richfield completed in the summer of 2000.
 {¶ 32} DeHoff, a Welty employee and the field manager for the VA project, did not testify at trial.
 {¶ 33} Based upon the evidence presented at trial, this Court finds that the trial court erred in granting Welty's counterclaim for back charges. Pursuant to Article 6 of the subcontract, Welty could assess back charges against Liberty for damages Welty sustained as a result of "any default or any breach of any provision[.]" Article 12 also provides Welty with the authority to assess back charges to Liberty. As quoted above, Article 12 states that if Liberty fails "to perform Work with promptness and diligence" then Welty has a right to "provide through itself or through others, any such labor or materials necessary to perform the Work until, in the sole judgment of [Welty], the deficiencies of [Liberty's] Work have been corrected, and deduct the cost thereof from any money due, or thereafter otherwise to become due [Liberty] under this Agreement[.]" In accordance with Article 12, if Welty elects to hire replacement subcontractors to repair or correct the work that Liberty failed to complete then it must provide Liberty with 72 hour notice.
 {¶ 34} The testimony presented by Berger and Regan demonstrates that Liberty was never given 72 hour notice as required by Article 12. Berger testified that Welty did not provide Liberty with 72 hour notice before it hired Richfield and S M to complete certain work. Furthermore, the October 17, 2001 letter, which Regan sent to Liberty indicating that Liberty had 72 hours before replacement subcontractors were hired, did not satisfy the Article 12 notice requirement. First, the invoices submitted by Richfield and S M show that the corrective work that they completed was done in the year 2000, which was before
Liberty received the October 17, 2001 letter. Second, the October 17, 2001 letter only indicated that Welty was giving Liberty notice that the contract would be terminated if Liberty did not complete the punch list items. The letter failed to discuss back charges for work Richfield and S M completed. Because Welty failed to provide Liberty with 72 hour notice as required by the subcontract, Welty was not entitled to assess back charges for work performed by Richfield and S M.
 {¶ 35} Further, the trial court granted back charges for work Lindsay Concrete Products, Inc. completed; the subcontractor was hired to fix the crypts that Liberty allegedly damaged during the course of its work. The record, specifically Defendant's Exhibit JJ, demonstrates that Lindsay Concrete Products, Inc. submitted a bill, dated May 24, 2000, in the amount of $2,052 for damaged crypts. However, noted on the bottom of the bill is the statement: "Crypts were damaged by Liberty [and] S M." The record further indicates that Liberty was never given 72 hour notice regarding the repair of the damaged crypts. Thus, we cannot say that Welty was entitled to receive back charges for crypt damage.
 {¶ 36} Although Welty was not entitled to receive compensation for back charges, this Court finds that the trial court did not err in granting Welty $13,250 for unfinished punch list items. The August 3, 2001 letter informed Liberty that it had to return to the VA project by August 13, 2001 to complete the punch list items in one week. Liberty, albeit later than indicated in the letter, returned to the VA project. It completed some of the punch list items, but failed to complete all of the punch list items as agreed by both parties. Liberty was later sent the October 17, 2001 letter, which informed Liberty that it had 72 hours to complete the punch list items or the subcontract would be terminated. Liberty failed to return to the VA project and, pursuant to the October 17, 2001 letter and Article 12 of the subcontract, Welty terminated the contract.
 {¶ 37} According to the trial court, Welty was holding monies due to Liberty for unpaid invoices, but per the August 31, 2001 letter Liberty was still responsible for completing the punch list items. Welty presented testimony to show that another subcontractor, Kiehl, was hired to complete the punch list work and the quote for that work was $13,250. While testimony during the trial indicated Liberty would have been paid $11,450 for the punch list items, that fact is not relevant to what Kiehl quoted Welty to complete the work. This Court is highly deferential to the trial court's factual determinations. After hearing the evidence presented at trial and viewing the credibility of the witnesses, the trial court determined that Welty was entitled to $13,250 for the punch list items. This Court finds that the record supports the trial court's finding with some competent, credible evidence and we decline to alter the set-off amount for the punch list items.[4]
 {¶ 38} Based on the foregoing, this Court finds that the record lacks competent, credible evidence to support the trial court's decision to award Welty a set-off of $27,056 for back charges. However, competent, credible evidence does exist to support a finding that Welty was entitled to $13,250 for punch list items. Liberty's first assignment of error concerning the back charges has merit. Liberty's second assignment of error on the punch list items set-off amount lacks merit.
 ASSIGNMENT OF ERROR NUMBER THREE
"The trial court committed prejudicial error in not awarding * * * liberty $55,830 in charges for extra work which [Welty] authorized and instructed [Liberty] to perform."
 {¶ 39} In Liberty's third assignment of error, it has argued that the trial court erred when it failed to award it $55,830 for work it completed at Welty's request. This Court disagrees.
 {¶ 40} As discussed in Liberty's first and second assignments of error, this Court will not reverse a trial court's judgment so long as it is supported by competent, credible evidence going to all of the essential elements of the case. C.E. Morris Constr.Co., 54 Ohio St.2d at 280.
 {¶ 41} This Court has thoroughly reviewed the record and we find that there exists some competent, credible evidence to support the trial court's finding that Liberty was not entitled to $55,830. The testimony presented at trial, along with the exhibits, indicate that Welty did not approve and was not aware of work that Liberty completed, totaling $23,651.[5] The evidence presented at trial also provided sufficient basis to support the trial court's finding that the remaining balance of unpaid invoices in the amount of $32,179 was either paid by Welty, never authorized by Welty, or was part of the underlying subcontract.
 {¶ 42} For the foregoing reasons, we find that the trial court did not err when it awarded Liberty $83,196 for unpaid invoices, rather than the $139,026.86 Liberty requested for unpaid invoices. As such, Liberty's third assignment of error is without merit.
 CROSS-ASSIGNMENT OF ERROR NUMBER ONE
"* * * The trial court's determination that welty owed $83,196.00 in outstanding quotes was against the manifest weight of the evidence and not supported by sufficient evidence."
 {¶ 43} In Welty's cross-assignment of error it has argued that the trial court's finding that Liberty was entitled to $83,196 for unpaid invoices was against the manifest weight of the evidence and not supported by sufficient evidence. This Court disagrees.
 {¶ 44} When an appellant challenges a judgment in a civil case as against the manifest weight of the evidence, an appellate court's standard of review is the same as that in a criminal context. Frederick v. Born (Aug. 21, 1996), 9th Dist. No. 95CA006286, at 14. In determining whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 45} An appellate court that overturns a trial court's judgment as against the manifest weight of the evidence acts in effect as a "thirteenth juror," setting aside the resolution of testimony and evidence as found by the trier of fact. State v.Thompkins (1997), 78 Ohio St.3d 380, 387. This action is reserved for the exceptional case where the evidence presented weighs heavily in favor of the defendant. Otten,33 Ohio App.3d at 340. "A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." State v. Haydon (Dec. 22, 1999), 9th Dist. No. 19094, at 14, appeal not allowed (2000), 88 Ohio St.3d 1482. Additionally, it is well established that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 46} In the instant matter, Welty has argued that the trial court erred in granting Liberty $83,196 in unpaid invoices for several reasons. Welty has argued that the evidence presented at trial established "that Welty had, in fact, either subsequently paid for most of the items listed as `outstanding quotes' via legitimate change orders to the Subcontract Agreement and that the remaining quotes relating to the second top soil amendment were rejected by the VA as being part of Liberty's original Scope of Work." Welty has further argued that trial court's decision was against the manifest weight because the trial court relied on an account summary, dated July 2, 2001, which showed an incorrect outstanding balance of VA quotes. After reviewing the record, this Court finds little merit in Welty's arguments.
 {¶ 47} Attached to the August 3, 2001 letter was an account summary created by Welty, dated July 2, 2001 and marked as Plaintiff's Exhibit 12. The account summary states that the remaining balance of outstanding quotes to the VA was $83,196. Thus, according to a document created by Welty, Liberty was entitled to $83,196 on July 2, 2001. However, another document, created by Welty and dated November 12, 2002, indicates that the remaining balance of outstanding quotes to the VA was $46,095. In this latter document, the outstanding quotes are for "Weather Conditions" and "Screen Plant." Welty has claimed that the outstanding quotes to the VA were reduced by $37,101 in November 2002, because it issued change orders 8 and 11. The evidence presented at trial, however, indicated that even though change orders had been accepted and the VA disbursed money to Welty for these change orders, Liberty never received this money or full payment for the unpaid invoices. The trial court is in the best position to judge the credibility of the witnesses and found that Liberty was entitled to receive $83,196. This Court is therefore loathe to reverse the trial court's finding. Consequently, Welty's cross-assignment of error is not well taken.
 III {¶ 48} Liberty's first assignment of error is sustained and its second and third assignments of error are overruled. The trial court's decision granting Welty a set-off of $27,056 for back charges is reversed. This Court affirms the trial court's decision to grant Welty a set-off of $13,250 for the punch line items and its decision to deny Liberty an additional $55,830. Welty's cross-assignment of error is overruled. Accordingly, this Court affirms the trial court's judgment to Liberty in the amount of $83,196. But due to our reversal on Liberty's first assignment of error, Welty's set-offs must be corrected. Welty is entitled to a set-off in the amount of $13,250, minus the $7,480 that can be deducted for the final retainage amounts still being withheld against Welty by the VA. Thus, Welty's actual set-off is $5,770. Pursuant to App.R. 12(B), this Court may enter the judgment the trial court should have entered. Therefore, this Court enters judgment in the amount of $77,426 in favor of Liberty.[6]
Judgment affirmed in part, and reversed in part.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to both parties equally.
Exceptions.
Carr, P.J., Boyle, J., concur.
[1] When the matter proceeded to trial, Liberty did not pursue its claim for fraud. The action for fraud was withdrawn.
[2] At trial, Liberty requested the trial court grant it damages in the amount of $139,126.86, plus interest, for work completed pursuant to the terms of the subcontract.
[3] As discussed infra, Welty requested $27,056.35 in back charges and $13,250 for punch list items Liberty failed to complete.
[4] In Liberty's response to Welty's appellate brief, it has argued that Welty's punch list is not a reliable source of evidence because it was not admissible as business records under Evid.R. 803(6). Liberty argued that Welty never properly authenticated the punch list. This Court notes that Liberty never challenged the authenticity or reliability of Welty's punch list. The only evidence Liberty challenged at trial, and its post-trial brief, was Defendant's Exhibit V. Because this is the first time Liberty has challenged the reliability or admissibility of Welty's punch list, it has waived this argument on appeal. Limlev. Laboratory Corp. of America (2000), 137 Ohio App.3d 434, 438
(holding that failure to timely advise trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal). As such, this Court declines to address this argument.
[5] This Court acknowledges Liberty's argument that Welty stated that it would not argue a lack of written authorization, but the record reveals that Welty did not actually say it would not argue lack of written authorization. Welty said "[O]ur position is that for certain of the invoices, they are in dispute — they are in dispute not for the basis. It's just lacking a signature or approval, but the fact that, as [Plaintiff's counsel] summarized, we did not either approve the work ahead of time or we cannot substantiate that the work was done pursuant to our request, so the evidence will show today that there's copies of some invoices floating around and you will see basically we have no record of the work being done. So it's not a question of, here's a ticket, it's not signed. It's a question of investigation was done, and people from Welty will say they have no knowledge of it, didn't authorize it."
[6] Liberty's damages of $83,196 minus Welty's set-off of $5,770 (13,250-7480) = $77,426.