OPINION
{¶ 1} Plaintiff-appellant, Christopher ("Chris") P. Doyle, appeals the decision of the Warren County Court of Common Pleas, Domestic Relations Division, dividing the marital assets following his divorce from defendant-appellee, Deborah E. Doyle.
 {¶ 2} The parties married on October 17, 1982. Prior to the marriage, each of the parties had two biological children and no children were born as issue of the marriage. In 1983, Chris began working for a coin-operated machine rental business. The business became known as Seneca Coin and, in 1985, the parties purchased the business for *Page 2 
approximately $700,000. The business was very successful and, as a result, they were able to pay off the purchase price within two years. Seneca Coin was primarily managed by Chris while Deborah had virtually no involvement with the business operations. During the marriage, Deborah operated Home Accents, a home furnishing business. Testimony indicated that Seneca Coin grossed between $600,000 and $800,000 per year through 1992, while Home Accents was only marginally profitable. Although the parties were involved in these and a few other ventures during the marriage, it is clear the parties' "very nice lifestyle" was supported by Seneca Coin.
 {¶ 3} However, Chris engaged in an extramarital affair and, on April 12, 1990, he murdered his girlfriend and their two-week-old daughter. Following a guilty plea to two counts of aggravated murder, Chris was sentenced to two consecutive terms of 20 years to life in prison. Immediately following the murders, Chris transferred all of his assets to Deborah, purportedly to protect the assets from a wrongful death action. As a result, Deborah began to manage Seneca Coin; however, it was difficult for her because, as the domestic relations court noted in its decision, she appeared "to have little business understanding" due to only having "an 11th grade education" and "almost ran the business into the ground." In addition, Deborah stopped running Home Accents because, as she testified, nobody wanted to buy from the business following Chris' incarceration. Despite being incarcerated, Chris directed Deborah and other employees of Seneca Coin about the management of the business.
 {¶ 4} The family of the victims filed a wrongful death action against Chris and a fraudulent conveyance action against both Chris and Deborah. The suit was eventually settled for only $25,000.
 {¶ 5} Testimony revealed that after Chris went to prison, many clients of Seneca Coin left, or threatened to leave, because they "did not want to do business with a baby killer." Deborah testified that after Chris went to prison, she ran Seneca Coin, but really only served *Page 3 
as a bookkeeper because the business was primarily managed by the company's accountant, Beverly Bohring. In July 1999, Deborah's son, Cole, accepted power-of-attorney from Chris to manage the business. In addition to running the business, Chris also instructed Cole to write checks to Deborah for financial support. Thereafter, in June 2000, Chris requested that Beverly Bohring visit him at the prison to negotiate for her to purchase Seneca Coin. They agreed to a price of $300,000, which was to be paid at the rate of about $2,000 per week over a 172-week period. After making numerous payments, Ms. Bohring eventually made a lump sum payment of $140,000 for the remainder of the sale price.
 {¶ 6} In late 2002, Cole grew tired of serving as the fiduciary for the proceeds from the sale of Seneca Coin and decided to return the checkbook to Deborah. Upon receiving the checkbook, approximately $133,000 remained in the account. Deborah took that money and purchased a condominium in Findlay, Ohio, located at 15391 N. Point Drive.
 {¶ 7} Thereafter in 2004, Chris granted power-of-attorney to his financial assets to his son, Shawn. Upon receipt of the account which held the proceeds of sale of the business, Shawn testified that there were no remaining funds in the account.
 {¶ 8} In September 2004, Chris filed a complaint for divorce. As part of the divorce proceedings, the domestic relations court conducted a hearing regarding the division of marital property. On January 23, 2006, the court issued the final decree of divorce along with a division of marital and separate property. In its decision, the court found that for the purpose of the division of marital property, the date of the termination of the marriage was April 12, 1990, the date of the murders committed by Chris. The court held that it would be inequitable to use any other date because on that date the "parties have lived separate and apart since that time, divided up their property and, shortly thereafter, settled various lawsuits against them."
 {¶ 9} Further, the domestic relations court awarded the following to Deborah: real *Page 4 
estate located at 217 Vista Lane, Fostoria, Ohio (a rental property owned by Deborah before the marriage); real estate located at 1011 Ebersole, Fostoria, Ohio (the marital residence); real estate located at 15391 North Point Drive, Findlay, Ohio; real estate located at 614 Union Street, Fostoria, Ohio (property inherited by Deborah in 1998); real estate located at 630 Jackson Ave., Fostoria, Ohio (property inherited by Deborah in 1998); any remaining proceeds of Seneca Coin; an annuity in her name; and any vehicles or financial accounts in her name. The court awarded Chris an annuity in his name and the sum of $7,833.68, which represents his assets on April 12, 1990, less his total indebtedness. Chris timely appealed, raising two assignments of error.
 {¶ 10} Assignment of Error No. 1:
 {¶ 11} "THE TRIAL COURT ERRED IN DETERMINING THE DURATION OF THE MARRIAGE FOR PURPOSES OF DIVISION OF MARITAL PROPERTY."
 {¶ 12} Chris argues in his first assignment of error that the domestic relations court abused its discretion by using April 12, 1990 as the termination date of the marriage. He asserts the court did not correctly consider the factors enumerated in R.C. 3105.171 to determine the duration of the marriage. Chris argues that a review of the factors does not support the conclusion reached by the domestic relations court because Chris remained involved in the marriage while in prison, remained involved in the business of Seneca Coin, and controlled the proceeds of its sale. Further, Chris submits that the parties did not divide all of their marital property by April 12, 1990.
 {¶ 13} The trial court has broad discretion in choosing the appropriate marriage termination date for purposes of property valuation. Berish v. Berish (1982), 69 Ohio St.2d 318, 319. Therefore, we will not disturb the trial court's finding absent an abuse of discretion. Id. The term "abuse of discretion" means that the trial court's judgment is "unreasonable, arbitrary or unconscionable."Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. "The *Page 5 
abuse of discretion standard is based upon the principle that a trial court must have the discretion in domestic relations matters to do what is equitable given the facts and circumstances of each case."Jefferies v. Stanzak (1999), 135 Ohio App.3d 176, 179, citing Booth v.Booth (1989), 44 Ohio St.3d 142, 144.
 {¶ 14} R.C. 3105.171(A)(2) provides, "`During the marriage' means whichever of the following is applicable: (a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation; (b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, `during the marriage' means the period of time between those dates selected and specified by the court."
 {¶ 15} Thus, R.C. 3105.171(A)(2) creates a statutory presumption that the proper date for the termination of a marriage, for purposes of division of marital property, is the date of the final divorce hearing.Bowen v. Bowen (1999), 132 Ohio App.3d 616, 630. However, the statute permits a trial court to select a different date of termination, if it considers the date of the final divorce hearing to be "inequitable." Id.
 {¶ 16} The Supreme Court of Ohio has noted: "The choice of a date as of which assets available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations. * * * [T]he precise date upon which any marriage irretrievably breaks down is extremely difficult to determine, and this court will avoid promulgating any unworkable rules with regard to this determination. It is the equitableness of the result reached that must stand the test of fairness on review." Berish at 319-320.
 {¶ 17} Here, the domestic relations court found that it would be inequitable to use the date of the final divorce hearing as the date of termination for the marriage. Instead, the *Page 6 
court determined that April 12, 1990 was the proper termination date. The court acknowledged that there "continued to be some economic entanglement between the parties (especially as it related to Seneca Coin)." However, the court noted that the parties "lived separate and apart since that time" due to Chris' incarceration. Further the court stated that at that time the parties "divided up their property and, shortly thereafter, settled various lawsuits against them."
 {¶ 18} After a review of the record, it is clear that the evidence presented at trial and testimony of the witnesses supports the domestic relations court's finding that the marriage terminated on April 12, 1990. Therefore, we find the domestic relations court did not abuse its discretion in selecting April 12, 1990 as the termination date for the marriage. Accordingly, Chris' first assignment of error is overruled.
 {¶ 19} Assignment of Error No. 2:
 {¶ 20} "THE TRIAL COURT ERRED IN ORDERING A DIVISION OF PROPERTY THAT WAS INEQUITABLE AND UNEQUAL."
 {¶ 21} Chris asserts in his second assignment of error that the domestic relations court erred in its division of the parties' marital property because it "perpetuates a windfall to Mrs. Doyle." Specifically, Chris argues the domestic relations court did not correctly distribute the proceeds of the sale of Seneca Coin. Chris argues that the court erroneously found that he had no equity interests in any real property including 15391 North Point Dr., 1001 Ebersole, and 1610 N. County Line. Further, Chris claims he is entitled to an equal division of the proceeds from the sale of the Florida property owned by the parties and not simply a representative portion of the property's value in April 1990. Finally, Chris argues there is "no legal authority" for the domestic relations court to determine that his marital assets should be offset by the attorney fees that were expended on behalf of his criminal case. He claims the attorney fees are a joint marital debt. *Page 7 
 {¶ 22} The trial court is vested with broad discretion in establishing an equitable division of marital property in a divorce action.Middendorf v. Middendorf, 82 Ohio St.3d 397, 401, 1998-Ohio-403. A reviewing court may modify a property division only upon a finding that the trial court abused its discretion in dividing the property.Cherry v. Cherry (1981), 66 Ohio St.2d 348, 355. "The mere fact that a property division is unequal, does not, standing alone, amount to an abuse of discretion." Id. at paragraph 2 of the syllabus.
 {¶ 23} R.C. 3105.171(C)(1) provides, "[e]xcept as provided in this division or division (E) of this section, the division of marital property shall be equal. If an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable. In making a division of marital property, the court shall consider all relevant factors, including those set forth in division (F) of this section."
 {¶ 24} A domestic relations award should be fair, equitable and in accordance with law. See Martin v. Martin (1985), 18 Ohio St.3d 292. Although an equal division of property is a starting point, the division need not be equal in order to be equitable. See Kaechele v.Kaechele (1988), 35 Ohio St.3d 93.
 {¶ 25} R.C. 3105.171(F) provides factors to determine an equitable division of property. The factors are: (1) the duration of the marriage; (2) the assets and liabilities of the spouses; (3) the desirability of awarding the family home, or the right to reside in the family home for reasonable periods of time, to the spouse with custody of the children of the marriage; (4) the liquidity of the property to be distributed; (5) the economic desirability of retaining intact an asset or an interest in an asset; (6) the tax consequences of the property division upon the respective awards to be made to each spouse; (7) the costs of sale, if it is necessary that an asset be sold to effectuate an equitable distribution of property; (8) any division or disbursement of property made in a separation agreement that was voluntarily *Page 8 
entered into by the spouses; (9) any other factor that the court expressly finds to be relevant and equitable.
 {¶ 26} Further, we note that it is not an abuse of discretion for a trial court to award substantially more of the marital assets to the wife than the husband when the husband, by his criminal misconduct, reduces the means of support for his wife. See Taylor v. Taylor (Nov. 19, 1999), Montgomery App. No. 17727, 1999 WL 1043934 at 3, citing,Leadingham v. Leadingham (1997), 120 Ohio App.3d 496. InTaylor, the Second District held that the trial court did not abuse its discretion in awarding a wife "virtually all" of the marital assets where the husband had been found guilty of two counts of aggravated murder and one count of attempted murder, and subsequently received a death sentence for the convictions. Id.
 {¶ 27} In this case, the domestic relations court specifically noted that it considered all of the relevant factors set forth in R.C.3105.171(A), (B), (C), and (F). Further, the court addressed the division of the proceeds from the sale of Seneca Coin; including 1610 N. County Line (the headquarters of Seneca Coin), and 15391 N. Point Drive (the condominium purchased by Deborah from the proceeds of the sale of the business).
 {¶ 28} The domestic relations court stated, "the parties attempted to value the assets of Husband as of April 12, 1990 (the date of the murders). It was concluded that Husband was worth $25,000 and said amount was paid to the victims. Husband now argues that the amounts provided were fraudulent as it was obvious that the business was worth a substantially greater amount. Husband argues that since the documents were signed by Wife, that he should not be penalized for her allegedly fraudulent conduct. However, it is clear that Husband and Wife were co-defendants in the civil suit for fraudulent conveyance and wrongful death. Husband was a clear beneficiary of any undervaluation of assets and cannot claim innocence or lack of knowledge. * * * He was an active consultant to Seneca Coin even though in prison. As Shawn Doyle testified, Husband wanted to take care of Wife *Page 9 
for the rest of her life. Given Husband's active participation as a consultant and Wife's lack of business acumen, the Court concludes that Husband was an active participant in the settlement figures. * * *
 {¶ 29} "Assuming these items were undervalued, it would not be fair to allow a murderer to benefit from this alleged fraudulent activity. It was the intent that Husband have nothing, so he should not be able to benefit from any undervaluation of assets.
 {¶ 30} "Given the foregoing, the Court finds that Husband had no equity in any of the assets set forth in Exhibit I (including all Seneca Coin assets) as of the date of the settlement of the fraudulent conveyance-wrongful death lawsuit. Accordingly, any funds in Seneca Coin used for the Findlay condo shall be the funds of Wife."
 {¶ 31} Similarly, the domestic relations court found that after settlement of the lawsuit, Chris also had no equity in the Ebersole property. With regards to the sale of the Florida property, the domestic relations court held, "In 1989, Husband and Wife bought two lots in Cape Coral, Florida valued at $35,000. For whatever reason, such lots were not included in the assets of Husband at the time of the wrongful death suit. Wife failed to offer any coherent testimony regarding the indebtedness on these lots, if any, by April 1990. * * * As of April 1990, Husband was owed one-half of $35,000 or $17,500. Wife will be required to pay same to Husband. The court notes that these lots were eventually sold for $179,900 in 2004. Wife has been living off the funds. This is not an equal division of property, but the Court finds it to be an equitable division. Prior to Husband's misconduct, Wife had a very nice standard of living. She has little ability to make a similar income. Any increase in appreciation was necessary for her support."
 {¶ 32} After a full review of the record, we find that the domestic relations court did not abuse its discretion in its division of marital property in this case. The court provided support from the record for the division as well as reasons that the division was equitable. It is clear *Page 10 
that Chris agreed to, and even initiated, the transfer of all of his property to Deborah following his criminal acts. We also note that Chris intended to provide support to Deborah for the remainder of her lifetime and the division of property by the domestic relations court was necessary for the support. Further, we find no abuse by the domestic relations court offsetting Chris' assets by the attorney fees. Accordingly, Chris' second assignment of error is overruled.
 {¶ 33} Judgment affirmed.
 WALSH and POWELL, JJ., concur. *Page 1