[Cite as *Waligura v. Waligura*, 2023-Ohio-3747.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| MICHAEL WALIGURA, | : | |
| Appellee, | : | CASE NO. CA2022-11-076 |
| | : | O P I N I O N |
| - vs - | : | 10/16/2023 |
| | : | |
| SARAH WALIGURA, | : | |
| Appellant. | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 2020 DRA 00661

Zachary D. Smith, LLC, and Zachary D. Smith, for appellee.

Smith, Meier & Webb, LPA, and Andrew P. Meier, for appellant.

**M. POWELL, J.**

{¶ 1} Appellant, Sarah Waligura ("Wife"), appeals a decision of the Clermont County Court of Common Pleas, Domestic Relations Division, granting a divorce between her and appellee Michael Waligura ("Husband"), dividing their property, and awarding spousal and child support to Wife.

{¶ 2} Husband and Wife were married on July 18, 1998. Three children were born issue of their marriage, only one of which remained a minor for purposes of this appeal.

{¶ 3} Wife has a master's degree and is working toward her doctorate. During the marriage, Wife worked as a speech language pathologist for several different employers, on a full-time and part-time basis. Wife last worked as a speech language pathologist on a full-time basis in 1998. In 2018, Wife left a part-time speech language pathologist job at Coryville Catholic Elementary School, working two and a half days per week, earning $25,000 per year. Currently, Wife is employed as an Amazon delivery person earning $36,400 per year. Husband works as an environmental engineer in a position he has held for many years, earning $112,230.41 per year.

{¶ 4} In the fall of 2014, Wife's father died suddenly, leaving behind a large estate initially valued at $2,524,631. However, the affairs of the estate were far from tidy. The bulk of the estate was an antique business in Virginia that "hoarded" numerous goods and pieces of furniture that were difficult to inventory. The estate faced lawsuits from various claimants for goods on consignment, for which the business had no record, and its commercial property was in default. Wife was appointed executrix of the estate and undertook sorting its problems. In 2018 she left her employment as a speech language pathologist and took a leave of absence from her doctoral program to focus on her duties with the estate.

{¶ 5} After Wife was relieved of her estate duties, she never returned to speech language pathology, citing various excuses such as a broken ankle in 2020, COVID, her daughter's struggles, and the divorce. If Wife does not complete her doctorate by 2026 and assume work as a speech language pathologist with children, she will be forced to repay $87,000 in grant funding.

{¶ 6} In June 2019, the parties agreed to attempt a collaborative process to

terminate their marriage. Several months after the collaborative process failed, Husband moved from the marital residence and opened a separate bank account. On June 1, 2020, Husband filed a complaint for divorce and Wife filed an answer and counterclaim on July 9, 2020. The matter proceeded to a two-day final hearing on October 26 and 27, 2021.

{¶ 7} At the hearing, Husband presented expert testimony from Dr. Carl Sabo, a vocational expert who evaluated Wife's earning capacity. Based on her qualifications, her work history, and the job market in the Cincinnati metropolitan area, Dr. Sabo believed that Wife could command a salary of $90,000 per year as a speech language pathologist. Wife testified that she believes this estimate is unrealistic and that she does not know anyone in her field in the area earning $90,000 per year. However, Wife admitted that she could obtain a full-time position as a speech language pathologist working with school children for a salary of $56,000 per year.

{¶ 8} By decision of June 29, 2022, the trial court decided the unresolved issues of the divorce. A decree of divorce and a decree of shared parenting were journalized on October 20, 2022. The trial court found Wife to be voluntarily underemployed and imputed an income of $56,000 per year for purposes of calculating child support and spousal support. In light of the disparity between Husband's income and Wife's imputed income, the trial court ordered Husband to pay spousal support to Wife in the amount of $622 per month from July 1, 2022 until July 1, 2025, and $408 per month from July 1, 2025 until June 1, 2027. Husband was also ordered to pay approximately $730 per month in child support and cash medical support.

{¶ 9} On appeal, Wife raises three assignments of error for our review.

{¶ 10} Assignment of Error No. 1:

{¶ 11} THE TRIAL COURT ERRED IN CALCULATING CHILD SUPPORT AND SPOUSAL SUPPORT

{¶ 12} In her first assignment of error, Wife claims that the trial court erred in finding her voluntarily underemployed and in imputing additional income for purposes of calculating child support and spousal support. Wife claims that she is not voluntarily underemployed because: (1) her duties as executrix of her father's estate were time-consuming and required travel necessitating that she resign her part-time employment as a speech language pathologist in 2018; (2) the time demands of pursuing her doctorate do not permit her to have full-time employment as a speech language pathologist; (3) she fractured her ankle; and (4) she had not worked full-time as a speech language pathologist for seven years.

{¶ 13} R.C. 3119.01(C)(11) permits a trial court to impute income to a parent who is voluntarily underemployed for the purpose of determining the parent's child support obligation. The statutory section on spousal support is less explicit on the issue, nevertheless R.C. 3105.18(C)(1)(b) directs courts to consider the "earning abilities" of the parties as opposed to their actual earnings in considering an award of spousal support. *Spillane v. Spillane*, 12th Dist. No. CA2019-12-206, 2020-Ohio-5052, ¶ 17. Therefore, this court and other courts have approved a trial court's imputation of income for purposes of determining spousal support. *Id.*

{¶ 14} The earning ability of a party involves "'both the amount of money one is capable of earning by his or her qualifications, as well as his or her ability to obtain such employment.'" *Schenck v. Schenck*, 12th Dist. Butler No. CA2012-08-150, 2013-Ohio-991, ¶ 17, quoting *Carroll v. Carroll*, 5th Dist. Delaware No. 2004-CAF-05035, 2004-Ohio-6710, ¶ 22. When considering the relative earning abilities of the parties in connection with an award of spousal support, courts need not restrict their inquiry to the amount of money actually earned but may also hold a person accountable for the amount of money the person could have earned if he or she had made the effort. *Schenck* at ¶ 17.

- 4 -

{¶ 15} As with other spousal support determinations, findings of whether a party is voluntarily underemployed, and the amount of income that should be imputed, if any, are factual determinations to be made by the trial court based on the circumstances of each particular case. *Schenck*, 2013-Ohio-991 at ¶ 17; *Rock v. Cabral*, 67 Ohio St.3d 108, 112 (1993). Absent an abuse of discretion, the trial court's determination on these issues will not be disturbed on appeal. *Id.*

{¶ 16} By the time of the final divorce hearing, Wife had been released from her role as executrix and her ankle had healed. Although Wife contends she cannot be expected to work full-time while pursuing her doctorate, she is currently employed full-time as an Amazon delivery person, earning $36,400 per year. Dr. Sabo's expert testimony indicated that with her current credentials and experience, Wife could earn $90,000 annually by working full-time as a speech language pathologist in the Cincinnati metropolitan area. Wife testified that she would prefer to work as a speech language pathologist in a school setting with pre-K through eighth grade students, which is consistent with her work experience, and that she could obtain a full-time job earning $56,000 per year, which is consistent with her half-time employment in which she earned $25,000 per year in the 2015-2016 school year.

{¶ 17} Based on this evidence, the trial court did not abuse its discretion in finding that Wife was voluntarily underemployed and imputing annual income to her of $56,000.

{¶ 18} Wife's first assignment of error is overruled.

{¶ 19} Assignment of Error No. 2:

{¶ 20} THE TRIAL COURT IMPROPERLY CLASSIFIED THE MONEY LOANED TO THE PARTIES BY WIFE'S MOTHER AND STEPFATHER AS A GIFT.

{¶ 21} In her second assignment of error, Wife claims that the trial court erred by classifying $23,594.81 which her mother and stepfather gave to the parties in several payments to assist with various home repairs, as a gift. Wife asserts that there was no

competent, credible evidence that the money was a gift as opposed to a loan, and therefore the trial court's finding was against the manifest weight of the evidence. We disagree.

{¶ 22} The classification of property as a loan or a gift is a factual determination reviewed under a manifest weight standard of review. *O'Donnell v. O'Donnell*, 12th Dist. Butler No. CA2003-05-119, 2004-Ohio-2484, ¶ 4, citing *Johnson v. Johnson*, 12th Dist. Warren No. CA99-01-001, 1999 Ohio App. LEXIS 4596 (Sept. 27, 1999). "This standard of review is highly deferential; even 'some' competent, credible evidence is sufficient to sustain the trial court's judgment." *O'Donnell* at ¶ 4, citing *Barkley v. Barkley*, 119 Ohio App.3d 155,159 (4th Dist.1997).

{¶ 23} Here, Husband and Wife provided conflicting testimony concerning the money. Husband testified that it was a gift from wife's parents and that he never discussed repayment. Wife testified it was discussed between the parties and her parents as a loan. However, in reaching its decision, the trial court noted that Wife produced no promissory notes, payment records, or any evidence demonstrating that the money from her mother and stepfather should be considered a loan and not a gift.

{¶ 24} Neither wife's mother nor stepfather testified about the nature of the transfer of money. In the approximately ten years since the money was given to the parties, Wife's mother and stepfather have not requested or pursued repayment. For instance, Wife's mother and stepfather made a payment of approximately $7,000 to the parties while they awaited an insurance settlement. Yet, when the parties later received the insurance settlement, the $7,000 was not repaid.

{¶ 25} Based upon the lack of documentation, as well as the lack of any demand for repayment and the passage of time, the trial court's finding that the money was a gift as opposed to a loan was not against the manifest weight of the evidence, despite wife's testimony to the contrary.

{¶ 26} Wife's second assignment of error is overruled.

{¶ 27} Assignment of Error No. 3:

{¶ 28} THE TRIAL COURT ERRED IN CHOOSING THE DATE OF THE VALUATION AS THE DATE OF FILING OF THE COMPLAINT FOR DIVORCE

{¶ 29} In her third assignment of error, Wife claims that the court erred in using the date Husband filed his complaint for divorce, June 1, 2020, as the de facto termination date of the marriage rather than the date of the final divorce hearing on October 26, 2021. Wife argues that the parties' financial affairs remained entangled until the final divorce hearing, that the court placed too much emphasis on the parties' physical separation in choosing the valuation date, and that the trial court failed to make any findings as to why June 1, 2020 was more equitable than October 26, 2021.

{¶ 30} "Generally, the proper date for the termination of a marriage, for purposes of property division, is the date of the final divorce hearing." *Dellinger v. Dellinger*, 12th Dist. Butler No. CA2015-12-229, 2016-Ohio-4995, ¶ 20, citing *Fillis v. Fillis*, 12th Dist. Clermont No. CA2008-10-093, 2009-Ohio-2808, ¶ 8. This is a "statutory presumption" that is set forth under R.C. 3105.171(A)(2)(a). *Williams v. Williams*, 12th Dist. Warren No. CA2012-08-074, 2013-Ohio-3318, ¶ 24. However, pursuant to R.C. 3105.171(A)(2)(b), if the domestic relations court finds the time period between the date of the marriage and the date of the final divorce hearing would be "inequitable," the domestic relations court may select dates that it considers equitable in determining marital property. See *Doyle v. Doyle*, 12th Dist. Warren No. CA2006-02-027, 2007-Ohio-2554, ¶ 15. "Because the domestic relations court has broad discretion to select dates it considers equitable, and because the determination of the termination date of a marriage is largely a question of fact, this court will not disturb the domestic relations court's finding absent an abuse of discretion." *Vaughn v. Vaughn*, 12th Dist. Warren No. CA2021-08-078, 2022-Ohio-1805, ¶ 50, citing *Roberts v. Roberts*,

12th Dist. Clinton Nos. CA2012-07-015 and CA2012-07-016, 2013-Ohio-1733, ¶ 28.

{¶ 31} Here the trial court found that, for the purpose of determining what property is marital and what property is separate, it would not be equitable to use the final hearing date as the termination of the marriage date. In support of its finding, the court recognized that the parties first attempted a collaborative process to terminate their marriage in June 2019, but several months after the collaborative process failed, Husband moved from the marital residence and started a separate bank account. The trial court further recognized that by the time Husband filed his complaint for divorce on June 1, 2020, both parties maintained separate bank accounts and credit cards, and did not associate with each other except as required for the co-parenting of their minor daughter.

{¶ 32} Although a spouse's unilateral decision to leave the marital home does not, in and of itself, constitute a de facto termination of marriage, "the act of filing a divorce complaint formally and clearly shows the spouse's intent regarding the marriage." *Roberts*, at ¶ 29. Accordingly, we find the trial court did not abuse its discretion in establishing June 1, 2020 as the de facto termination date of the marriage.

{¶ 33} Wife's third assignment of error is overruled.

{¶ 34} Judgment affirmed.

PIPER, P.J., and BYRNE, J., concur.